CHERTKOF, ET AL. *v.* THE PHILADELPHIA, BALTIMORE AND WASHINGTON RAILROAD COMPANY, ET AL.

[No. 333, September Term, 1968.]

*Decided July 3, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Benjamin Lipsitz,* with whom was *Eleanor J. Lipsitz* on the brief, for appellants.

*George W. Constable,* with whom were *John D. Alexander, Jr.* and *Constable, Alexander & Daneker* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

The Chertkofs [1] have appealed from the decree of the chancellor, Cullen, J., dated 21 October 1968, dismissing their bill for the specific performance of what they insist is a contract with the Railroad [2] for the purchase of a

---

[1]. As used herein, the plural indicates the appellants, Howard L. Chertkof, E. Robert Chertkof and Jack O. Chertkof; the singular indicates Howard who acted for himself, his brother, Robert, and his father, Jack.

[2]. The defendants below, appellees here, are The Philadelphia, Baltimore and Washington Railroad Company and its lessee (999

parcel of its real estate. We shall affirm Judge Cullen's disposition of the dispute.

Chertkof sought to acquire from the Railroad a 19 acre tract of land in Anne Arundel County lying for the most part between the west side of the Railroad's right of way and a small stream known as Stony Run. The tract is a little over a mile long; it is at no point as much as 400 feet wide; for much of its length it is from 25 to 100 feet wide and at one point it is only ten feet wide. The northern boundary coincides with the south side of the Baltimore-Washington Expressway. The south end appears to border on Stony Run Road.

In August 1965 the Railroad caused to be prepared, using one of its printed forms, an agreement which it calls an "optional receipt." It states that the Railroad had agreed through "W. R. Dunn, Jr., Real Estate Agent, subject to the approval of the Board of Directors" to sell to the Chertkofs the property delineated on an attached plat for $10,000, of which $1,000 had been paid in cash; the balance was to be paid upon the delivery of the deed. The agreement requires the insertion in the deed, if executed, of a number of restrictive conditions seldom seen in run-of-the-mine deeds. The concluding paragraphs, being especially relevant to the issue before us, are set forth in full:

> "The delivery of said deed and settlement therefor (including the apportionment of the taxes to the date of such settlement) shall be made at such place as shall be mutually agreed upon and on a day to be mutually agreed upon but *within thirty (30) days after Grantor has notified Grantee that said Grantor is ready for settlement;* and *upon the failure of Grantee* to make such settlement at the time and place so fixed, the sum paid on account will be retained by Grantor *as liquidated damages;* and thereafter

years), The Pennsylvania Railroad Company. We shall treat them as one and call them the "Railroad."

Grantee shall not have any interest whatever in said premises.

"*In the event Grantor's Board of Directors fails to approve this sale,* or in the event it should develop that Grantor's title to said premises for any reason is not good and marketable, clear of all liens and encumbrances, excepting as aforesaid, and Grantee shall not be agreeable to accept title of such lesser quality as the Grantor is willing to give, *then the sum paid on account will be refunded to the Grantee,* who hereby agrees to accept same, whereupon this writing shall be cancelled and annulled and neither party hereto shall have any claim whatever against the other by reason hereof." (Emphasis added.)

The agreement was sent to Chertkof along with a letter dated 2 September 1965, which reads as follows:

"Herewith is agreement, in duplicate, covering the sale of the above mentioned property to you for consideration of $10,000.00. Will you please sign your names on the lines indicated, having two witnesses sign on the lines opposite your names and return both copies of the agreement to this office for execution on the part of the Railroad Company, together with your check in the amount of $1,000.00, made payable to the Railroad Company. The agreement will be dated when executed on behalf of our company.

"*It is understood, however, that this agreement is not to be construed to be a commitment on behalf of the Railroad Company, as it is necessary to secure Executive and Board approvals before the sale can be consummated.* [Emphasis added.]

"After the agreement has been executed on the part of the Railroad Company, a copy will be returned for your file.

"Your attention is expressly directed to the fact that this agreement shall be of no effect and null and void if same is not signed and returned within thirty (30) days from the date hereof.

> Yours very truly,
> /s/ F. J. Geist
> Real Estate Agent"

VTH :naf

Chertkof, himself a real estate broker, said he read and understood both the agreement and the letter. The agreement, signed by the Chertkofs, and a $1,000 check dated 7 September 1965 were returned to the Railroad which, by letter dated 14 September, acknowledged the receipt thereof, enclosing a fully executed copy of the agreement dated 13 September.

Frederick J. Geist, the Railroad's real estate agent in 1965 and 1966, testified as follows:

"THE WITNESS: When we had a sale of real estate being considered, we have to first fix in mind that there are three levels generally that the matter has to go through. We have the lowest, which is the division level, which takes a close look at the proposition. If we can get preliminary approvals from our divisional people, we send an optional form receipt of agreement to our regional level, which embraces three divisions. If the regional level sees no basic objections to the proposition as submitted to it, it comes back to the divisional level. That is, the executed optional receipt does. Then the divisional people start to progress the thing all over again."

\* \* \*

"THE WITNESS: At this point, the division has the responsibility of preparing a paper, which would be called the executive sale form letter. This is the paper which is approved by

officers in the division, the region and the system level, prior to actual preparation and execution of a deed. As far as—I think the original question was duties."

\* \* \*

"THE WITNESS: The executive sale form letter is the responsibility of the division to prepare for submission, again through the division, then to the region and then to the system."

Victor T. Hipple (VTH), Geist's assistant, whose service in the real estate department spanned 27 years, was Chertkof's only contact with the Railroad. He had been doing business with Hipple since 1958. In his "past dealings" with the Railroad, Chertkof had bought "many, many properties." "They [the Railroad] were always tardy in settlement" he said. "They generally notified us [of settlement] within a reasonable time; within a year, I would say" he added. After receiving the signed agreement from Geist (actually Hipple) Chertkof ordered the title examination. It was completed early in December.

Geist received a letter, dated 10 January 1966, from A. J. Hafner, the Railroad's Manager of Industrial Development, which is as follows:

"F. J. Geist
"This refers to proposed sale of 19 acres, between Stony Run Road and Baltimore-Washington Expressway to Howard L. Chertkof.
"Mr. D. B. Lenny, Assistant General Manager, Industrial Development, Philadelphia, advised that Mr. Smucker [Vice President, Operations] is opposed to selling this land because of current industrial activity in this general area.

A. J. Hafner"

Geist testified that he sent the letter to Hipple with the following endorsement:

"VTH
Tell Chertkof no (with thanks) and ccs to all

persons we wrote to for approval telling them reasons for rejection.

FJG 1/13"

Hipple telephoned Chertkof and told him he "had run into a snag." He passed on to him the contents of Hafner's letter to Geist and suggested they "wait and see the outcome of this particular industrial activity, as to how it affected the premises in question, and perhaps the matter could be resolved after the industrial activity had been consummated." He said they "were in touch with each other from then on until the time that letter [*infra*] was written cancelling the sale" and tendering the return of the $1,000 deposit. Chertkof denied having been told the contents of the Hafner letter but he did say that he had talked to Hipple on "many occasions" between December 1965 and November 1966. He thought it was "at least once every two to four weeks." In these conversations, at one time or another, Hipple revealed to him, in justification of the cancellation, plans for a high-speed rail line which might require the flattening of the curve of the main line where it passed through the property, negotiations with county authorities concerning rights of way and negotiations with others for the assembly of industrial tracts. At no time did Chertkof indicate a desire or intention to withdraw or demand the return of the $1,000 deposit.

On 8 November 1966 Geist (Hipple) wrote to Chertkof as follows:

"Dear Mr. Chertkof:

"Pursuant to telephone conversation with our Mr. Hipple, *we are unable to secure approval of the above sale* and would appreciate your arranging for all parties to the agreement to meet with our Mr. Hipple in order that we may return the money paid on account. [Emphasis added.]

"It will be necessary for Robert and Jack

Chertkof as well as yourself to be present to sign a cancellation endorsement attached to the original agreement.

> Very truly yours,
> /s/ F. J. Geist
> Real Estate Agent"

vth

Chertkof, on 15 November 1966, replied as follows:

"Dear Mr. Geist:

"I wish to acknowledge receipt of your letter of November 8, 1966 on the above subject, and evidently, you do not have the true facts in this matter.

"Your letter states: '* * * we are unable to secure approval of the above sale * * *.' However, more than eight months ago we were advised that the contract had been approved and told that the reason for the delay in settlement was due to the tremendous work load of your Engineering Department in Philadelphia, which department was preparing the description of the land required for the preparation of the deed.

"We are making demand that a settlement take place on or before December 20, 1966; otherwise, we will file legal proceedings.

> Very truly yours,
> /s/ Howard L. Chertkof

HLC:cd
bcc: Mr. Howard A. Sweeten"
 (An attorney)

On 21 November 1966 Geist, for the Railroad, replied. His letter follows:

"Dear Mr. Chertkof:

"Yours of November 15, 1966:

"Please refer to this Railroad's standard optional receipt form of agreement in the subject matter dated September 13, 1965, particularly to

the third and fourth lines thereof reading in part 'subject to the approval of the Board of Directors of said Grantor' and to the last paragraph on Page 2 thereof reading in part 'in the event Grantor's Board of Directors fails to approve this sale * * * then the sum paid on account will be refunded to the Grantee, who hereby agrees to accept same, whereupon this writing shall be cancelled and annulled and neither party hereto shall have any claim whatever against the other by reason hereof.'

"We regret to advise you that we have been unable to secure the approval of this sale by our Board of Directors.

"Accordingly, will you please arrange for the proper execution and witnessing of the attached Rider, then telephone this office, at which time we will arrange to meet with you in your office and deliver to you the $1,000 refund of down money in exchange for the executed and witnessed Rider.

Yours very truly,<br>
/s/ F. J. Geist<br>
Real Estate Agent"

FJG :naf

At this point there should be included in this recital the resolution of the Railroad (Pennsylvania)·adopted by its Board of Directors on 21 February 1962:

"RESOLVED that any sale of real estate or an interest therein which, in the opinion of the President, any Vice President or the General Manager, Real Estate, shall be no longer necessary for the operation of the Company's railroad, and which involves a consideration not exceeding $100,000., may be made upon such terms and for such consideration as in the judgment of the President, any Vice President or the Gen-

eral Manager, Real Estate, are just and reasonable, and any of them is authorized to enter into and execute in the name of the Company, under its corporate seal or otherwise, contracts or agreements for the sale of such real estate or interest therein, the authority so exercised to be reported semiannually to the Board.

"RESOLVED that the President, any Vice President or the General Manager, Real Estate, is authorized and empowered, in the event of such sales, to execute deeds and all papers or instruments in connection therewith, to affix the corporate seal thereto, and to acknowledge and deliver the same, and take all other actions and do all other things, *all with the same force and effect as if a specific resolution were adopted by the Board in each case.*" (Emphasis added.)

Substantially the same resolution ("the authority so exercised to be reported to the Board at its next meeting" being the only change) was adopted by the Railroad (P. B. & W.) on 14 May 1962. Chertkof was familiar with these resolutions having received copies of them in connection with the purchase of other properties.

The Chertkofs filed their bill of complaint in Circuit Court No. 2 of Baltimore City on 21 February 1967. Six grounds for specific performance were alleged: (a) the Directors approved the sale; (b) Board approval was unnecessary because of the resolutions; (c) the Railroad represented that the contract had been approved; (d) the Railroad unreasonably delayed notification of non-approval; (e) the Railroad waived the requirement of approval; (f) the Railroad is estopped from relying on the requirement of approval.

On 12 June 1968 the case came on for trial before Judge Cullen who held it sub curia until 16 September when he filed his opinion. He said Mr. Smucker's disapproval was "in essence tantamount to disapproval by the Board of Directors." The arguments based on "laches, waiver and

estoppel * * * [were] ill founded," he added. He found that submission of the contract to the Directors "was a condition precedent to the formation of the contract, that the condition was complied with and was subsequently disapproved by the Board, Mr. Smucker acting as its authorized representative, [and] that as a result the contract never materialized."

## I.

It is at once obvious that the agreement gave the Railroad the option to sell or not to sell the property. Had the Directors, qua Directors, actually considered and disapproved, or failed to approve, the agreement, the Chertkofs, without question, would have been entitled to nothing but the return of their money. We think it is equally obvious, and axiomatic as well, that the Board of Directors had the right to delegate to the principal officers of the company the power and authority (within limits) to sell the Railroad's property, if in their judgment the consideration was thought to be just and reasonable and the property not needed for operations. The resolution conferring this power, authority and discretion upon the named officers was known to the Chertkofs (they had copies in their files on other properties). By its very terms the resolution endowed their acts (or non-acts) with all "the same force and effect as if a specific resolution were adopted by the Board in each case." The power and authority to sell the Railroad's land, unless otherwise limited, necessarily included the power and authority not to sell. It seems to us, for instance, that the obligation to determine whether the property is any "longer necessary for the operation of the Company's railroad" suggests the possibility that the officers might have to make a judgment requiring the veto of a proposed sale. *See generally Penowa Coal Sales Co. v. Gibbs & Co.*, 199 Md. 114, 119 (1952); *Eastern Shore Brokerage & Comm'n Co. v. Harrison*, 141 Md. 91, 100 (1922); *Northern Central Ry. v. Bastian*, 15 Md. 494, 501 (1860). Ironically the Chertkofs, in paragraph 14 of their bill of complaint, insisted

that Board approval was unnecessary, that the officers had the power to make the sale and, in fact, approved it.

The Chertkofs were thoroughly aware of the Railroad's procedures. They had bought "many, many properties" from the Railroad in the past. But even if that were not so the warnings in this instance were explicit. The agreement begins by providing that it is "subject to the approval of the Board of Directors" and it concludes with the words, "In the event Grantor's Board of Directors *fails to approve this sale * * *.*" (Emphasis added.) The letter of transmittal, it will be recalled, reiterated in blunt and unmistakable terms the twice repeated reservation of the agreement, citing the necessity of securing *"Executive and Board* approvals before the sale can be consummated." (Emphasis added.) It can hardly be said that the Chertkofs were not in a position to know something of the magnitude and extent of the Pennsylvania Railroad System. It should not be cause for wonder, by them or anyone, that a $2,500,000,000 transportation complex with 10,000 miles of railroad should find it necessary to adopt the procedures outlined by Geist in order to avoid serious blunders in the disposition of its surplus real estate. Keeping the right hand advised of the left hand's activities would seem to require constant care and much attention.

We think this aspect of the case is controlled by *Julius Kessler & Co. v. Askin,* 135 Md. 647 (1920). In that case Kessler's salesmen, Berkowitz and Rosenbaum, solicited an order for whiskey from Askin. The printed order, a copy of which was left with Askin, contained a notice or statement that salesmen were not authorized to make contracts other than as therein specified, and that the *contract was subject to the approval of the home office.* Askin gave his check for $250 which, together with the contract, was sent by Berkowitz to the home office. Kessler, the president, returned the check to Askin and told him that the order would not be accepted. Askin was successful in the court below but this Court reversed. Judge Burke, for the Court, said:

"* * * The order signed by the plaintiff gave notice to him that the authority of the salesman was limited. Precisely the same limitation was contained in the previous orders. There was no obligation assumed by the defendant under its terms until it was approved by the home office. It was not approved, and the obligation of the defendant to ship the goods never arose. There is no evidence in the case tending to show that either Berkowitz or Rosenbaum had authority to waive the condition in the order, or to make a contract binding upon the defendant. The condition expressed in the order was a reasonable one, and was intended to control the credits of the defendant company. Certainly Berkowitz had no such authority to waive this condition and we failed to find any facts upon which it could be legally inferred that Rosenbaum had such power or authority. The case is controlled by the principles announced in *Brager v. Levy*, 122 Md. 554, and the undisputed facts, which we have stated, have led us to the conclusion that in the light of those principles there was no legally sufficient evidence in the case to entitle the plaintiff to recover * * *."
*Id.* at 648-49.

*See also Langdon v. Sibley*, 100 N.H. 373, 127 A. 2d 156 (1956); *Walter Pratt & Co. v. G. W. Chaffin & Co.*, 136 N.C. 350, 48 S.E. 768 (1904); 1 A. Corbin, *Contracts* §§ 61, 82 (1963); 1 W. Page, *Contracts* § 197 (1920).

We are not impressed with the Chertkofs' theory of waiver. A contract cannot be created by waiver. See *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521 (1964). The cases cited by the Chertkofs involve waivers of conditions under contracts already in existence. Here the contract had yet to arise. In any event we have not found in this record any evidence that the Railroad waived anything, voluntarily or otherwise. Any inference of waiver,

in the circumstances, would have to be raised on something Hipple said or did and, it is quite evident, we think, that Hipple could not waive the necessity of approval by the Board of Directors since he had no authority to commit them to anything in the first place. Neither can estoppel operate to create a contract. See *Kline v. Lightman,* 243 Md. 460 (1966). In *Savonis v. Burke,* 241 Md. 316, 319 (1966), we said:

> "It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped."

Oddly enough the Chertkofs rebut their own argument in this regard. They took the position at trial that the sale was approved when the agreement came back from Philadelphia, which would have been about 15 September 1965. If, as they insist, they were misled, they misled themselves. As we said in *Food Fair Stores, Inc. v. Blumberg, supra:*

> "An essential element of estoppel is that the person sought to be estopped must be guilty of some wrongful or unconscientious conduct, on which the other party has relied and been misled to his injury." *Id.* at 532.

We have not found any evidence of wrongful or unconscientious conduct nor any evidence of injury, other than the Title Company's charge which might have been avoided had they waited for notice of a settlement date. They were resigned to a wait of a year, which they thought not unreasonable; Geist's letter (8 November 1966) was only seven weeks beyond a full year.

## II.

The Chertkofs contend that Judge Cullen fell into er-

ror when he admitted into evidence the Hafner memorandum and certain testimony concerning it. The Railroad insists the memorandum is admissible under Code, Art. 35, § 59 (1965 Repl. Vol.). We find it unnecessary to consider its admissibility under the statute. Before the memorandum was offered in evidence, Geist testified, without objection, as follows:

> "THE WITNESS: * * * but in January before we had a plan, which is necessary for the executive sale form letter, I heard that Mr. Smucker was against this sale. So I never proceeded to prepare an executive sale form letter because I couldn't have even initialed the thing myself to get the thing started.
>
> "THE COURT: So you heard something about something in the organization which made you quit?
>
> "THE WITNESS: Correct."

Since the Hafner memorandum does little more than restate Geist's testimony the Chertkofs' objection must be treated as waived. Maryland Rule 522 d 2. In any event its admission was harmless.

### III.

The final assignment of error arises out of Judge Cullen's refusal to allow Hipple and Dunn to be called as adverse witnesses as provided in Code, Art. 35, § 9 (1965 Repl. Vol.). Since neither Hipple nor Dunn was an "officer, director or managing agent" of the Railroad we think Judge Cullen's ruling was correct. See *Hagerstown Brewing Co. v. Gates,* 117 Md. 348, 360 (1912). Despite his ruling, however, we cannot see how the Chertkofs were prejudiced thereby. They were in no way inhibited in their questioning of Dunn. Although Hipple was questioned at length, only one question was proscribed by the court and that, in our judgment, was of little or no importance. Moreover Hipple was called as a witness by

the Railroad giving the Chertkofs the right, of which they availed themselves, to cross-examine him.

## IV.

It seems odd to us that the Chertkofs did not address a letter to the Board of Directors of the Railroad demanding consideration of the agreement and insisting upon either approval or disapproval. We think it unlikely that the Board would have chosen to ignore such a letter.

*Decree affirmed. Costs to be paid by the appellants.*