# HELEN W. MIKE *v.* SERVICE REVIEW, INC.

[No. 204, September Term, 1973.]

*Decided October 31, 1973.*

288

The cause was argued before ORTH, C. J., and MORTON, THOMPSON and LOWE, JJ.

*John T. Enoch,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellant.

*Hamilton O'Dunne,* with whom was *Patrick A. O'Doherty* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

Helen W. Mike (Mrs. Mike) filed an action in the Superior Court of Baltimore City against Allstate Insurance Company (Allstate), Retail Credit Company, Cooper-Holmes Bureau, Inc., and Service Review, Inc. (Service) claiming that she had been libeled. The suit was dismissed as to Retail Credit Company, and Cooper-Holmes Bureau, Inc. A demurrer by Allstate Insurance Company was sustained with leave to amend, and, upon failure to amend, a judgment absolute for costs was entered in its favor. Upon suggestion of Mrs. Mike the case was removed to the Circuit Court for Carroll County. The case was submitted to trial by jury. At the close of all the evidence Service moved for a directed verdict, and the motion was granted. Maryland Rule 552. Judgment was entered in favor of Service and against Mrs. Mike for costs. Mrs. Mike appealed.

The factual basis of the suit is not complicated. Mrs. Mike had placed herself in the "good hands" of Allstate to insure her against liability with respect to the operation of her automobile, but there came a time when Allstate preferred not to have her as one of its insured. It notified her by letter dated 18 February 1969 that the policy of 11 January 1969 was cancelled as of 20 March 1969 and enclosed a premium refund in the amount of $22.50, from a total yearly premium

of $94.00. The letter informed her of the cancellation of the policy in this language:

> "All insurance companies have certain qualifying standards which, together with our judgment and experience, tell us whether we can provide insurance in each individual case. Cars and drivers that can be insured by one company might not meet the standards of another company.
>
> In providing insurance protection many factors are considered — such as mileage, use of the car, where it's driven, the ages of the drivers, driving and accident record and other factors.
>
> Sometimes, because of these standards, we must decide to give up business we might otherwise like to have. This happens only after thorough consideration of each individual case. We're sorry that we are unable to continue providing you with protection under the insurance policy listed above."

There was a postscript:

> "Upon written request of the Named Insured mailed or delivered to Allstate prior to the effective date of cancellation, Allstate will specify the reason or reasons for the cancellation."

Mrs. Mike availed herself of the opportunity offered in the postscript and by letter of 28 February from Allstate's Underwriting Department the reasons were specified. They were succinctly put:

> "As you may know, many insurance companies, under certain circumstances, conduct routine investigations to assist them in selecting and retaining an average group of policyholders. In your case, it is alleged you are living in a common-law arrangement. For this reason, it was determined that we could no longer continue to offer you coverage under this policy." [1]

---

1. The letter indicated that a carbon copy had been sent to the State

290

The basis of the allegation of a "common-law arrangement" was an "Automobile Insurance Report" of an investigation made by Service on a printed form which was completed by check marks indicating "yes" or "no" answers to various questions and by terse comments. The information was sparse. It indicated Mrs. Mike was 51 years of age, employed by the Social Security Administration in a clerical position. Under the heading "Specific Marital Status" the box "Divorced" was checked. Under the heading "Lives with", the designations "Wife and Family", "Parents", "Relative", and "Alone" were all unchecked, but there was written in "Common Law". In a space provided for amplification was written: "The insured is living with a man appx her age. Sources advise that he is her boy friend." Under a designation "Recommended", "No" was checked, and following was written, "Morals".

Mrs. Mike replied to the letter of 28 February:

"Thank you for your letter of February 28, 1969, with regard to the explanation you gave for cancelling my insurance. I can only say (politely) you have been misinformed and that I feel very sorry for the person or persons who saw fit to give such information. It only proves one thing to me, that we live in a very sick society. I can't imagine anyone stooping so low without positive proof. More baffling, is that your company would accept such information on hear say. Since there is more than just a cancellation of insurance involved here, like defamation of character, I ask that you endeavor to make another investigation as someone has made a grievous error.

True, I am separated, but if you knew the circumstances, which I consider my own personal

<hr>

Insurance Department. That Department wrote Mrs. Mike on 5 March acknowledging receipt of a copy of the letter and stating that if the information was correct, "it appears we could not disagree with their decision." The Department said it would discuss with her the reasons given for the cancellation if she disagreed with them.

business, I am sure you might have a little compassion and lean just a little towards me.

I am working very hard at two jobs trying to support myself and a 10-year old daughter. Up until two months ago I had an older daughter also living with me. Her leaving is the reason for purchasing the car. I also occasionally contribute to the support of my son.

Now if your term 'common-law arrangement' means what I think, I suggest you take another look at my birthday and draw your own conclusion. Also, I would like to know when 1 might find time for this behavior.

You can believe one thing, this isn't the end of this as I intend to find the evil-minded person or persons who have nothing else to do but pass judgment on someone else."

As a result of Mrs. Mike's letter Service made a recheck and gave a summary of the reinvestigation in narrative form:

"Mrs. Mike has lived at 807 Edmondson Ave., Baltimore, Maryland for the past 1 1/2 years. The dwelling is a one and a half story cape cod type building, with two rooms upstairs. The house is owned by a Mr. James Gabin. Mrs. Mike has a young daughter living with her, approximately 10 years old. She did have an older daughter, approximately 25 years old, living with her until the first of this year. She has worked for the Social Security Administration for the time known at this address. She drives a 1960 Dodge. Mr. Gabin owns a later model Dodge, est., 1962 or 1963. The occupants of 807 Edmondson Ave. do not associate closely with any other residents of this community. According to neighbors, there are three residents of this house, Mrs. Mike, her daughter, and Mr. Gabin. Next door neighbors who seem to know the occupants of 807 Edmondson Ave. best, do not know Mrs. Mike by that name, and refer to her as

Mrs. Gabin. She is described as being a woman approximately 5' 4" tall, heavy set, with a round face, and wears her hair done up on the top of her head. She is seen outside the house only to hang out clothes, and to leave for work. No other woman is seen around this house. This dwelling is a one family type building, with one front and one rear entrance, and does not appear to be converted into a two family dwelling. As neighbors are not close to the occupants of 807 Edmondson, they do not know the exact marital status of the occupants, but assume them to be married or living with each other.

Prior to moving to 807 Edmondson Ave., 1 1/2 years ago, Mrs. Mike lived at 510 Valcour Ave., Baltimore, Md. for approximately 2+ years. She was married to Herman Mike, a policeman for the city of Baltimore, and had 3 children at home. While living at 510 Valcour Ave., Mr. Herman Mike and Mrs. Helen Mike enjoyed a good standing and reputation in the community. They lived in a well kept middle income home, which was well furnished and maintained. They were not known to have had any marital problems, and the neighbors were surprised when Mrs. Mike left with the two daughters 1 1/2 years ago. Mr. and Mrs. Herman Mike are now legally separated and a divorce is pending. Mrs. Herman Mike was described as a woman approximately 5' 4" tall, heavy set, round face, and wore her hair done up on the top of her head. The home at 510 Valcour Ave. is still occupied by Mr. Herman Mike and his son approximately 18 years of age. The home is still well maintained and furnished, and Mrs. Mike took only her clothing and personal effects when she left. Mr. Mike is still well respected in the community, and there is no criticism on him as a result of this separation. Mrs. Mike was a housewife until 2 years ago when she went to work for Social Security as a Clerk, which

was approximately 6 months prior to her leaving 510 Valcour Ave. She did not own an auto at this time.

* * *

We have been unable to determine that Mrs. Mike works at any job other than the Social Security Administration, nor that she contributes anything to the support of her son who lives with his father at 510 Valcour Ave.

During the course of this re-investigation, we have contacted Mr. Herman Mike, and he states that he and Helen Mike are legally separated, and a divorce is pending. He offers no reason for the separation, and that he was surprised by his wife's action in leaving him. He has never visited the 807 Edmondson Ave. address and does not know what type living arrangement his wife and daughter have. He is not critical of his wife in any way, nor hostile towards her.

This investigation has covered all available sources at both addresses during the evening, weekend, and two days this week. We have exhausted all available leads to develop this situation further. As Mr. Gabin who owns the house at 807 Edmondson was believed unmarried prior to Mrs. Mike moving into this house, and the fact that no other woman is ever seen around this house, and that neighbors describe Mrs. Gabin the same as former neighbors describe Mrs. Mike, plus the fact that Mrs. Mike is separated and not divorced yet, our original report appears correct."

Mrs. Mike testified as to the actual situation. She was divorced from Norman B. Mike in June 1970 after having been married for 30 years. There were four children of the marriage. She was separated from her husband in July of 1967, leaving their residence at 510 Valcour Road and going to her mother's house at 8 Augusta Avenue in Catonsville. She remained there for several weeks and then moved to 807

Edmondson Avenue, about a block from her mother's residence. She rented a second floor apartment at that address from a Mr. and Mrs. James Gavin, who lived there with their daughter, occupying the first floor. She learned about the apartment from her father. Both families used the front door, but the first floor apartment was "all closed off. It was a door there she kept locked." The second floor apartment consisted of a bedroom, a living room, a kitchen, and a bath. Two of her daughters lived with her. She lived there until June of 1971, working at the Social Security Administration in the day and as a saleswoman in the Mill End Shop, Westview Shopping Center, at night. In December 1968 one of the daughters, who owned a car, moved, and Mrs. Mike bought a 1960 Dodge and obtained a liability insurance binder from Allstate. She recounted the circumstances of the cancellation of the insurance coverage. She described her relationship with Mr. Gavin:

> "There was none except, well, I didn't have anything to do with him. I gave the rent to Mrs. Gavin all the time. I hardly ever saw Mr. Gavin. Like I say I was working two jobs and Saturday and Sunday I did my own laundry at a laundramat. I did not use Mrs. Gavin's back yard. And I would say it was nothing other than to speak to him when I saw him which was very seldom."

Testimony of Mrs. Gavin corroborated what Mrs. Mike said concerning her relationship with the Gavins.

James Phelps was the inspector who made the report on Mrs. Mike for Service. He said he made about 20 reports a day. On automobile insurance reports he was required to contact two independent sources who knew the subject of the investigation. "They wish that we would confirm adverse information by at least two sources." His sources of information about Mrs. Mike were her neighbors. "The neighbor to the left side of the dwelling as you face from Edmondson Avenue and a neighbor in a Ceramic Shop on the adjacent corner" were the sources who "indicated that she was living with a man she was not married to and they

were presumably very close friends, possibly of an immoral nature * * *." It was elicited that in a deposition Phelps had said that 807 Edmondson Avenue appeared to be a single family dwelling from the outside, that he had not been inside and that information had come from one neighbor next door. That neighbor said she never heard of Mrs. Mike; Mrs. Gavin lived next door. She talked to Mrs. Gavin while she was hanging up clothes. The neighbor called the woman Mrs. Gavin and "she never bothered to correct her." She identified the woman about whom he was inquiring as driving a white Dodge. The other neighbor said she had seen a woman living at 807 Edmondson Avenue driving a white car but did not know her and had never talked to her. Phelps did not talk to Mrs. Mike. When he went "direct to the front door" and asked to speak to Mrs. Mike, "a middle aged man answered the door and further refused to give me any information and slammed the door. * * * [H]e flatly refused to tell me anything."

It was Phelps who conducted the reinvestigation as set out in his report. It was the neighbor next door who said the "lady drivin' a white Dodge lives in that house with Mr. Gavin. I've talked to her at the clothes line. I've passed the time of day. She's the only lady I've seen drivin' the car and as far as she knows she's the only lady living in the house." Her description of the woman "fits Mrs. Mike to a T."

Chapter 715, Acts 1967, codified as Code, Art. 48A, § 240B, provided:

> "If a policy or contract of motor vehicle liability insurance which has been in effect for at least sixty days, is cancelled or nonrenewed, for a reason other than nonpayment of premium, the insurance company or its duly authorized agent shall notify the insured in the cancellation notice that he has a right to request the reason for cancellation. If the request for a reason is made within thirty (30) days prior to the date of the proposed cancellation or expiration of the policy, as the case may be, the company shall give the actual reason or reasons relied upon by it for the cancellation or nonrenewal

and shall file a copy of this statement of the reason or reasons with the Insurance Commissioner. The explanation shall be privileged and shall not constitute grounds for any action against the insurer or representatives or any firm, person, or corporation who or which in good faith furnishes to the insurer the information upon which the reasons are based. The provisions of this section do not apply to policies of liability insurance issued under the Maryland automobile insurance plan."

The history of the statute thereafter is somewhat muddled. By Chapter 389, Acts 1968, the General Assembly added a new § 240C to Art. 48A, "to follow immediately after Section 240B thereof", to read as follows:

"If an applicant for a policy of ordinary motor vehicle liability insurance is refused such a policy, by an authorized insurer or its agent, and such insurer or agent offers or seeks to insure such applicant under the Maryland automobile insurance plan for assigned risks or if such applicant eventually does become insured under such assigned risk plan, and the applicant, within thirty (30) days of the date on which the refusal is given, makes a request to the insurer or its agent in writing for a statement of the reason or reasons why the ordinary policy was not issued, the insurer shall give the actual reason or reasons relied upon by it for refusing to issue said policy and shall file a copy of the statement of the reason or reasons with the Insurance Commissioner. The explanation shall be privileged and shall not constitute grounds for any action against the insurer or representatives or any firms, person, or corporation who or which in good faith furnishes to the insurer the information upon which the reasons are based."

The Act took effect 1 July 1968. The same session the General Assembly enacted Chapter 647, also adding new § 240C to Art. 48A, dealing with the changing of credit life or

disability insurance premiums. Chapter 610, Acts 1969, repealed and reenacted § 240B of Art. 48A, to take effect 1 July 1969. Its provisions were exactly those of Chapter 715, Acts, 1967, except that "fire insurance" was included. Chapter 436, Acts 1971, rewrote § 240B, and dealt with notice of renewal premium due.[2] The same chapter rewrote § 240C under the subtitle, "Statement of reason for cancellation or refusal to renew." It covered insurance policies "other than a policy of life or health insurance." Chapter 28, Acts 1972, excluded "motor vehicle liability insurance" from the provisions of the section, and Chapter 571, Acts 1973, excluded "surety insurance."

It appears, therefore, that at the time Mrs. Mike was covered by Allstate insurance and at the time it cancelled her policy, two laws concerning cancellation of such insurance had been enacted, Chapter 715, Acts 1967, codified as Art. 48A, § 240B, and Chapter 389, Acts 1968, codified as Art. 48A, § 240C. Whether Mrs. Mike was within the ambit of the former or the latter or both,[3] each required, upon request, a statement of reasons for refusing to issue the policy and each contained the provision: "The explanation shall be privileged and shall not constitute grounds for any action against the insurer or representatives or any firm, person, or corporation who or which in good faith furnishes to the insurer the information upon which the reasons are based."

One of the reasons given by the trial court in granting the motion of Service for a directed verdict was that the statutory privilege was controlling. It found "no basis for either malice or bad faith as far as the preparation of [the report of investigation and the reinvestigation report] are concerned." It could not find on the evidence adduced that Service "published the defamatory words without believing

---

2. A note in the 1971 Cumulative Supplement to volume 5 of the Code, discussing the effect of the amendments states: "No explanation of the change made by the 1969 amendment is now practical."

3. It is clear from the evidence adduced that after the cancellation of the Allstate policy Mrs. Mike was insured under the Maryland Automobile Insurance Plan for Assigned Risks.

them to be true or without honest or reasonable grounds to believe them to be so true."

We are in accord with the court below that if Service "in good faith" furnished Allstate the information upon which the reason for refusing to insure Mrs. Mike was based, the privilege afforded by the statute barred recovery. It is clear that Service was within the ambit of the statute as a corporation which furnished the insurer the information. And we think it apparent that both the original report and the reinvestigation report were within the contemplation of the statute. Both covered the same ground and the second investigation was simply an attempt to check the information set out in the first report. The question is whether Service furnished the information "in good faith." [4]

The statute does not spell out what is meant by "good faith". We think that a statement is made by a person in "good faith" if he, in fact, did not entertain serious doubts as to its truth. "Good faith" is not established, however, by the publisher baldly stating his belief that the statement was true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith should not be persuasive, for example, where an allegation was fabricated by the publisher, or was the product of his imagination, or was based upon unverified anonymous reports, or was inherently improbable, or was made in the face of obvious reasons to doubt the veracity of the source of information or its accuracy.[5]

In deciding whether a motion for a directed verdict was properly granted, we must consider the evidence, together

---

4. There was no plea of truth by way of justification. Maryland Rule 342 c 2 (h). We point out that Mrs. Mike was neither a "public official" nor a "public figure". As to such persons the federal constitution permits them to recover money damages for libel only if they can show that the defamatory publication was not only false but was uttered with "actual malice" — that is, with knowledge that it was false or with a reckless disregard of whether it was false or not. *Greenbelt Cooperative Publishing Assn., Inc., et al. v. Bresler*, 398 U. S. 6, 8. In any event, it is immaterial in the case before us what standard for recovery is applicable if the information was furnished in good faith.

5. Thus, to some extent, the determination of "good faith" *vel non* utilizes the measure of reckless conduct. See *St. Amant v. Thompson*, 390 U. S. 727, 732.

with all reasonable and legitimate inferences which may be deduced therefrom, in the light most favorable to the party against whom the motion was directed. *Stoskin v. Prensky,* 256 Md. 707, 709. We observe that the evidence with respect to what Phelps did, what he observed, and what he was told, was not refuted.[6] Considering the evidence in the light of the rule, we have no difficulty in concluding that it was legally sufficient to show that the information was furnished by Service to Allstate in "good faith." Even though the conclusion drawn by the investigator proved to be incorrect, it was not inherently improbable on what he had observed (the dwelling appearing to be a one family residence) and on what he had been told, there being no obvious reasons to doubt the veracity of the neighbor or the accuracy of her information. It may well be that the investigation of Mrs. Mike could have been more thorough, but in the circumstances we cannot say that the information developed was furnished Allstate with a lack of good faith. Therefore, the statutory privilege attached. The court did not err in granting Service's motion for a directed verdict.

*Judgments affirmed; appellant to pay costs.*[7]

---

6. Phelps was called by Mrs. Mike and permitted to testify as an adverse witness. We point out that Phelps was not a party to the suit and it was not shown that he was an officer, director, or managing agent of the corporate party, Service. Thus, he was not within the ambit of Code, Art. 35, § 9. *Chertkof v. Philadelphia, B. & Wash.R.R.,* 254 Md. 557. The general rule is that a person who produces a witness vouches for him as being worthy of credit, and no direct attack upon his veracity should be made by the party who produces him in the absence of surprise, hostility or deceit. The statute provides an exception as to adverse parties. *Proctor Elec. Co. v. Zink,* 217 Md. 22. See *Korotki v. Springer,* 218 Md. 191. The statute is to be strictly construed. *Williams v. Wheeler,* 252 Md. 75. It seems that by being allowed to interrogate Phelps by leading questions and to attempt to contradict and impeach him, Mrs. Mike obtained more than that to which she was entitled.

7. The judgment in favor of Allstate entered by the Superior Court of Baltimore City on 30 March 1971 was not a final judgment until all claims were adjudicated, the court having not directed that it be a final judgment upon a determination that there was no just reason for delay. Maryland Rule 605 a. Although the appeal noted was expressly from the judgment of the Circuit Court for Carroll County entered on 29 March 1973 in favor of Service, we affirm both judgments to make the record clear.