## MAYOR AND CITY COUNCIL OF BALTIMORE
### *v.* MARTHA AUSTIN, ETC.

[No. 179, September Term, 1978.]

*Decided November 3, 1978.*

The cause was argued before LOWE, LISS and MACDANIEL, JJ.

*William Hughes, Associate City Solicitor,* with whom were
*Benjamin L. Brown, City Solicitor,* and *William R. Phelan, Jr.,
Assistant City Solicitor,* on the brief, for appellant.

*Paul D. Bekman,* with whom were *William H. Engelman*
and *Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A.*
on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore, appellants
(hereinafter "the City"), appeals from judgments entered
against them in favor of the appellee, Martha Austin, as
mother and next friend of Camille Austin, deceased, and as
personal representative of the estate of Camille Austin.

The case arises out of a tragic accident which resulted in
the death by drowning of Camille Austin, aged five. In July
of 1974, the Department of Recreation and Parks of the City
of Baltimore, through the Bureau of Recreation, one of its
subdepartments, operated a day camp for children located at
the City's Cahill Recreation Center. The day camp was
designated as Camp Cahill. Enrollment in the camp was open
to children who applied from a particular area of Baltimore
and a fee of $3.50 a week was set as the charge for
participation in the program. The payment of the weekly fee
was in some instances adjusted or waived, and children were
permitted to participate if they were able to pay only part of
the fee or even if they were not able to pay any fee at all.
Nonpaying campers were offered the same services as those
who paid and persons not enrolled in the day care program
were permitted to participate in camp activities at Cahill
Center. Campers going on bus trips arranged by the camp
director paid an additional fee which was set at different rates
for campers and noncampers.

The director of Camp Cahill was required to prepare and
submit for approval a proposed budget to the Department of
Recreation and Parks. The budget, as prepared, contemplated
receipts of $7,000.00 to be paid by 250 campers at the rate of
$3.50 per week for eight weeks. Expenditures included the

cost of: hiring three additional leaders (for a total number of six leaders); providing milk or juice each day; hiring transportation for regular and special field trips; and purchasing arts and crafts supplies, postage and camp equipment. All money collected by the camp was remitted to the Department of Recreation, and all bills were paid by the Department. The program was subsidized by the City.

On July 19, 1974, a special chartered bus transported to Greenbrier State Park those members of the Cahill Camp who had paid the required bus fees and who had been given permission by their parents or guardians to participate in the trip outside the City of Baltimore. Greenbrier State Park is in Washington County, Maryland, approximately 90 miles from Baltimore. Camille Austin was one of the campers on the trip. Although Camille could not swim, she was permitted to go into the water without supervision. She drowned. It was admitted that no instructions, guidelines or special operating procedures were promulgated by the camp director for the safety of the children who were allowed to go into the water.

Clarice Patterson, the Senior Director of Cahill Recreation Center at the time of the accident, reported to a District Supervisor who in turn reported to the Superintendent of the Bureau of Recreation. The Superintendent was under the supervision of the Director of Parks who was answerable to the Mayor and City Council. Ms. Patterson, as the head of Camp Cahill, was charged with administering the programs at the camp within guidelines issued by the Department. Scheduled trips were arranged by Ms. Patterson, and it was also her responsibility to arrange for transportation to and from the designated trip area. The camp leaders were under her direction and control.

As a result of the death of Camille Austin, a two-count suit was filed by her mother as next friend and as personal representative of her daughter's estate. Martha Austin sought damages from the City, in the first count for the alleged negligence of the City that resulted in Camille's death. The specific claim in that count was for the loss of Camille's services and for the deprivation of the care, comfort and companionship of the deceased. In the second count, the

appellee claimed damage for the decedent's pain and suffering, and also claimed damages for medical and funeral expenses.

The City filed a motion raising preliminary objection in which it sought a ruling that the operation of Camp Cahill by the Bureau of Recreation was a governmental function and that the City was thereby immune to suit. A hearing was held before Judge James W. Murphy, and after argument, the court denied the City's motion. Subsequently, the City filed a general issue plea, and the case came on for trial before Judge J. Harold Grady and a jury. At the close of the City's case, it moved for a directed verdict raising issues of governmental immunity, and primary and contributory negligence. The motion was denied.

At the close of the entire case, appellant's motion for a directed verdict on the same issue was renewed and again denied. The jury returned a verdict in favor of the appellee on the first count, in the amount of $1,435.10, and for $150,000.00 on the second count. Appellant filed a motion non obstante verdicto, or in the alternative, for a new trial. These motions were denied. The judgments in favor of the appellee were made absolute in favor of the appellee, and it is from these judgments that this appeal was filed.

Two issues are raised by this appeal:

1. Did the court err in ruling that the operation of Camp Cahill by the City was not a governmental function?

2. Did the court err in allowing the appellee to use the deposition of Clarice Patterson, not a party to this suit, as an adverse witness?

Since the second issue raised by the City is an evidentiary one, we will, for the sake of convenience, consider it initially. Appellant contends that the trial court committed reversible error in permitting appellee's counsel to read into evidence, during appellee's case in chief, portions of the deposition of the director of Camp Cahill as if she were an adverse witness. The issue was raised as a preliminary matter before the trial

judge who conducted a hearing and ruled that the reading of the deposition was permissible in the appellee's case.

Maryland Code (1974), Section 9-113 of the Courts and Judicial Proceedings Article, provides: "In a civil case, a party or an officer, director, or *managing agent* of a corporation, partnership, or association may be called by the adverse party and interrogated as on cross-examination." (emphasis added)

Rule 413 (a) (2) of the Maryland Rules of Procedure states:

> The deposition of a party or of anyone who at the time of taking the deposition was *an* officer, director, *managing agent* or a person designated under Rule 405 b to testify on behalf of a public or private corporation, partnership, association or governmental agency which is a party may be used by an adverse party for any purpose. (emphasis added)

The Courts of Maryland have repeatedly held that Section 9-113, *supra,* must be strictly construed. *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 292 A. 2d 680 (1972); *Williams v. Wheeler,* 252 Md. 75, 249 A. 2d 104 (1969); *Mike v. Service Review, Inc.,* 19 Md. App. 287, 299 n.6, 310 A. 2d 585, 592 n.6 (1973).

The appellant and the appellee agree that the legal question here involved is whether Clarice Patterson was a "managing agent" for the purpose of this case. The testimony offered by the appellee revealed the following: Ms. Patterson was the director of Camp Cahill and had been its director for 14 years; she promulgated the rules for the camp; she was responsible for the enforcement of the rules; she prepared the budget for the camp; she suggested the number of employees needed to staff the camp; she assumed responsibility and control for the scheduling of trips away from camp property, and she obtained and provided transportation for these trips.

The City, in cross-examination of Ms. Patterson, elicited testimony from her that while she had the responsibility of setting the rules which governed Camp Cahill, that these rules were required to follow the guidelines issued by the Department of Recreation and Parks and she was under the

supervision and control of the Department's supervisors. All field trip programs were required to be approved by the Superintendent. The camp brochure, while prepared by Ms. Patterson, was subject to approval by her superiors. The staff at the Center was appointed by the Department, and the director of Camp Cahill had no power to hire employees.

From these factual findings, the trial court concluded that Ms. Patterson was a "managing agent" within the context of the statute and rule which we have quoted.

Black's Law Dictionary 86 (4th ed. 1951) defines a managing agent as "a person who is invested with general power, involving the exercise of judgment and discretion, as distinguished from an ordinary agent or employee, who acts in an inferior capacity, and under the direction and control of superior authority...."

The case which most nearly approaches the factual situation in the case at bar is *Scott County School District I v. Asher,* 312 N.E.2d 131 (Ind. App. 1974), *aff'd,* 324 N.E.2d 496 (1975). In that case, a high school student sued his school district to recover damages for an injury sustained by the student in his industrial arts class as a result of an accident involving a bench saw. The Indiana Rules of Procedure, Trial Rule 32(A)(2) permitted an adverse party to use a deposition for any purpose for "anyone who at the time of taking the deposition was an officer, director, or managing agent ... of an organization, including a governmental organization...." The court stated the test to be applied in determining whether a deponent was a management agent to be as follows:

> The test as to whether one serves in such capacity to a party so that the party may be deposed through him as managing agent is not title, but the functions performed in furtherance of the party's activities and interest. If the person has general powers to exercise his judgment and discretion dealing with corporate matters he may be deemed a managing agent. 312 N.E.2d at 135.

The Indiana Court of Appeals held that as the teacher was responsible for determining the type of saw to be purchased

for the shop class, as well as the safety features to be included, that he was a managing agent within the meaning of the deposition rules.

Cases in our own jurisdiction are of comparatively little help in resolving this issue. *Mike, supra,* merely states that the witness sought to be called as an adverse witness was not shown to be an officer, director or managing agent of the corporate defendant.

In *Chertkof v. Philadelphia, B. & W. R. R.,* 254 Md. 557, 255 A. 2d 14 (1969), the Court approved the trial court's refusal to permit two individuals to be called as adverse witnesses on the basis that neither was an "officer, director or managing agent" of the railroad. No factual basis for that conclusion was stated. Conversely, in *Honga River Gun Club, Inc. v. Montchester Gun Club, Inc.,* 20 Md. App. 335, 315 A. 2d 810 (1974), we held the head caretaker and guide of a gun club to be a managing agent of the club, again without any explanation for the factual holding.

In other jurisdictions, the acting police chief and head jailer was held to be a managing agent for a city, *Hodgins v. Oles,* 505 P. 2d 825 (Wash. App. 1973); a manager of a defendant's claim department and defendant's chief surgeon were held to be managing agents of a defendant railroad, *Krauss v. Erie Railroad Co.,* 16 F.R.D. 126 (S.D.N.Y. 1954).

We believe that Ms. Patterson was, in fact, the managing agent of the City so far as the Cahill Center program was concerned. She had wide authority and discretion, and while it is true that she was under the supervision of her superiors, her knowledge of the day-to-day operation of the Center was far more direct and superior to that of the Superintendent.

Assuming, *arguendo,* that she was not a managing agent, and that the trial court erred in allowing the use of her deposition in the appellee's case in chief, the error was harmless. Ms. Patterson appeared as a witness in the case, and her testimony was virtually identical to that read from the deposition. The Court of Appeals has held that if the trial court erred in admitting evidence through a witness, and if the same testimony is produced by other admissible testimony, that the error is harmless. *See Glen Burnie*

*Shopping Plaza, Inc. v. Schreiber Bros., Inc.,* 220 Md. 303, 152 A. 2d 807 (1958).

In *Seaboard Coastline Railroad Co. v. Hughes,* 521 S.W.2d 558 (1975), depositions were taken from two conductors whose train was involved in an accident. The trial court ruled they were managing agents and permitted their depositions to be read to the jury. The Tennessee Supreme Court held the trial court was in error in ruling that the conductors were managing agents, but affirmed the judgment on the ground that the error was harmless and nonprejudicial. The court said: "[S]ince one of the conductors testified and since his testimony, along with the testimony of other witnesses covered the essential areas of the non-testifying conductor, we are unable to say that this error affirmatively affected the outcome of the trial." *Id.* at 563.

We, therefore, find no reversible error in the trial court's rulings on this issue.

We now address ourselves to the issue of whether the trial court erred in holding that the operation of Camp Cahill by the City was not a governmental function.

It should be noted, preliminarily, that the appellant has raised no issue on appeal as to the finding of the jury that the City was negligent, and that this negligence caused the death of Camille Austin; nor has the appellant questioned, in this appeal, the reasonableness of the verdicts awarded by the jury.

Appellee has in her brief and argument presented an emotional appeal for the judicial abrogation in Maryland of the doctrine of governmental immunity for torts committed by municipal employees. She urges that we join the growing number of states which have, in the past few years, struck down the doctrine of municipal immunity from tort liability.[1]

---

1. Alabama (Jackson v. City of Florence, 320 So. 2d 68 (1975))
   Arkansas (Parish v. Pitts, 429 S.W.2d 45 (1968))
   Arizona (Stone v. Arizona Highway Commission, 381 P. 2d 107 (1963))
   California (Muskopf v. Corning Hospital District, 359 P. 2d 457 (1961))
   Colorado (Evans v. Board of County Commissioners, 482 P. 2d 968 (1971))
   Florida (Hargrove v. Town of Cocoa Beach, 96 So. 2d 130 (1957))
   Indiana (Brinkman v. City of Indianapolis, 231 N.E.2d 169 (1967))
   New Jersey (Willis v. Department of Conservation and Economic Development, 264 A. 2d 34 (1970))

The application of the doctrine of governmental immunity has resulted in many cases of unfair and unjust denial of the rights of citizens who have been injured by the negligence of municipal agents and employees. However, we are bound to follow the pronouncements of our own Court of Appeals. That Court has consistently refused to renounce the doctrine of sovereign immunity, and has stated that if the standard is to be abandoned or modified, it is the responsibility of the Legislature to do so. In *Duncan v. Koustenis,* 260 Md. 98, 104, 271 A. 2d 547 (1970), the Court of Appeals declined to abrogate governmental immunity by saying: "[B]ecause the doctrine is so deeply ingrained in the law of Maryland, this Court has specifically declined to alter it without a legislative mandate. *Weisner v. Board of Education of Montgomery County,* 237 Md. 391, 395, 206 A. 2d 560 (1965)." Similarly, in *Robinson v. Board of County Commissioners,* 262 Md. 342, 278 A. 2d 71 (1971), the Court was faced with the identical issue. The court responded:

> Robinson, con brio, importunes us to renounce those tenets "deeply ingrained in the law of Maryland," to enlist in the crusade against sovereign immunity and to join the ranks of those courts already marching under the pennons of the law professors. We shall not do so because we have said quite often that this is a province of the legislative bodies we ought not to invade. 262 Md. at 345.

In view of the adherence by the Court of Appeals to its position that any change in the law in this context must be made by legislative fiat, we must decline to disturb the doctrine of governmental immunity for tort as it presently exists in Maryland.

We are still left, however, with the determination of whether the defense of governmental immunity is available

---

New Mexico (Hicks v. State, 544 P. 2d 1153 (1976))

Pennsylvania (Ayala v. Philadelphia Board of Public Education, 305 A. 2d 877 (1973))

Wisconsin (Holytz v. City of Milwaukee, 115 N.W.2d 618 (1962))

District of Columbia (Spencer v. General Hospital of the District of Columbia, 425 F. 2d 479 (1969))

to the City under the circumstances of this case. We must determine whether the operation of Camp Cahill by the Bureau of Recreation and Parks was the exercise of a governmental or proprietary function as the availability of the governmental immunity defense is dependent on that determination.

The principal authorities on torts and municipal corporations have devoted a great deal of attention to the distinction between the governmental and proprietary functions of municipal governments. They have noted that the modern trend of judicial decisions is to restrict the doctrine of municipal immunity from tort liability. 2 Harper and James Torts 277, Comment to Section 29.1, n.2 (Supp. 1968); 18 E. McQuillin, Municipal Corporations Section 15.02 (3d ed. 1971); 57 Am. Jur.2d *Municipal, Etc., Tort Liability* Section 30 (1971).

W. Prosser, Torts Section 131 (4th ed. 1971), comments on the distinction between the legal theories as follows: "Certain functions and activities, which can be performed adequately only by the government, are more or less generally agreed to be 'governmental' in character, and so immune from tort liability." *Id.* at 979. He gives as examples of these functions: fire and police protection, removal of garbage and other health functions. He goes on to say:

> On the other hand, when the city performs a service which might as well be provided by a private corporation, and particularly when it collects revenue from it, the function is considered a "proprietary" one, as to which there may be liability for the torts of municipal agents within the scope of their employment. *Id.* at 980-81.

Similarly, 2 Harper and James, Torts Section 29.6 (1956) states the criteria to which the courts have looked in determining whether an activity is governmental or proprietary. They say:

> Those most often invoked are (1) whether the function is allocated to the municipality for its profit or special advantage or whether for the purpose of

carrying out the public functions of the state without special advantage to the city, and (2) whether the function is one historically performed by government. *Id.* at 1621.

18 E. McQuillin, Municipal Corporations, *supra,* Section 15.113, at 438, predicts:

[I]n view of the tendency of late decisions and the development of the law on this subject, the rule ultimately may prevail that in maintaining parks, playgrounds, bathing pools and beaches, and like recreations, the City should be held liable on the same basis as a private person or corporation.

The Court of Appeals has on several occasions recognized the difficulty in determining whether a particular function is proprietary or governmental. In *Mayor of Baltimore v. Eagers,* 167 Md. 128, 173 A. 56 (1934), the Court said:

It is often difficult to determine in a particular instance whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions. The decisions do not furnish a satisfactory test, as they are conflicting in their reasoning and conclusions. 167 Md. at 136.

In subsequent decisions, the Court has reconfirmed its problems with the proprietary-governmental distinction as in *Mayor of Balto. v. State, ex rel. Ahrens,* 168 Md. 619, 179 A. 169 (1935), where it said: "But as has been stated, the line of demarcation between private, corporate, and ministerial, and governmental, political, and discretionary activities or functions of municipalities is difficult to discern, and more difficult to define." 168 Md. at 625. The Court, in *E. Eyring & Sons v. Mayor of Baltimore,* 253 Md. 380, 382, 252 A. 2d 824 (1969), quoted Seasongood, *Municipal Corporations: Objections to the Governmental or Proprietary Test,* 22 Va. L. Rev. 910 (1936), as follows: "The rules sought to be established [in determining whether a given function is

governmental or proprietary] are as logical as those governing French irregular verbs."

The Court of Appeals has provided some guidance by way of tests and criteria to assist in the determination of whether a particular function is governmental or proprietary. In *Mayor & City Council v. Eagers, supra,* where the Court permitted a decedent's administrator to bring an action against the City of Baltimore when the decedent was killed by a limb of a tree falling upon him while he was walking in a public square maintained by the City, the Court said:

> If the neglect or wrongful act was in the course of the performance of a purely governmental duty which had been imposed upon the municipality as a governmental or public agency by legislative enactment, there would be no liability in tort in favor of an individual who had been injured. This doctrine has general recognition, and various grounds have been assigned in its support, notably, that, at common law, no civil action would lie against a municipal corporation for the neglect of a public duty imposed upon it as the agent of the public by general law for the benefit of the public generally, and from the performance of which the municipal corporation would receive no profit or special advantage. (citations omitted) If, on the contrary, the power given and the duty enjoined related to the local or special interests of the municipality, and be imperative, and not discretionary, legislative, nor judicial, and the wrongful act is done in the performance of such a duty, then the act is said to be done in the private or corporate capacity of the municipality as distinguished from an act done in its political and governmental capacity as an agency of the state, and the municipality must answer civilly for the negligence or want of skill of its agent or servant in the course of his employment, if the wrongful act result in injury to another, who is

free from contributory negligence. (citations omitted) *Id.* at 135.

Later, in *Reed v. Mayor of Baltimore,* 171 Md. 115, 188 A. 15 (1936), where a patron of a city-owned market was permitted to bring an action against the City for an injury sustained on one of the market passageways, the Court said:

> Moreover, since the purpose of the market is for public use, if the city has reserved to itself the power of controlling and keeping open the passageways therein, it would be liable to any one who, while using due care, sustained an injury because of the neglect or default of the city in keeping such passageways reasonably safe for public travel. Its duty to the public using the market is in this respect comparable to that of a department store owner toward his patrons and customers who are invited to enter it for the purpose of dealing. In such a case, the appellant would have been an invitee of the city, to whom it owed the duty of keeping its walk-ways in a reasonably safe condition for public travel. (citations omitted) 171 Md. at 119.
>
> * * *
>
> It seems clear that appellee, in owning the market and deriving a revenue from its stalls by way of rentals, was acting within its proprietary or private character, and would, therefore, be liable for negligence, assuming that, under similar facts and circumstances, liability would exist as against an individual. (citation omitted) 171 Md. at 118.

In *Mayor of Baltimore v. State, ex rel. Blueford,* 173 Md. 267, 195 A. 571 (1937), the Court of Appeals stated:

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature. 173 Md. at 276.

We restated these guidelines for determining governmental immunity when we said, in *Herilla v. Mayor of Baltimore,* 37 Md. App. 481, 378 A. 2d 162 (1977):

> Is the act for the common advantage of all, without special corporate gain or monetary profit, devoid of any ingredient of private interest, and does it improve the public health and welfare?

If the answer to the test question is in the affirmative, the act is governmental in nature and immunity applies. Conversely, if the answer is in the negative, it is a proprietary function and immunity may not be successfully pleaded. 37 Md. App. at 489.

We are charged with the duty of applying these legal principles in the light of the factual circumstances which are a part of this case. Appellee urges that in considering one of the criteria for determining governmental or proprietary function that we scrutinize the Camp Cahill budget, which was offered as an exhibit in this case. That document indicates that the camp fees projected when the budget was proposed would, at least, generate sufficient funds to cover the day-to-day expenses of the camp. We do not believe, however, that these fees amounted "to a profit or emolument inuring to the municipality" nor did it create a "special corporate gain or monetary profit" to the City. It is obvious that in spite of the fees paid by the day campers, the City had a substantial capital investment in the Cahill Recreation Center, and that it was required to subsidize the day-to-day operation of the Center and the day camp.

We believe the operation of the day camp was an activity solely for the public good which tended to benefit the public health and was devoid of any private interest. We find no distinction between the operation of Camp Cahill and the numerous other public recreation activities of the Bureau of Parks and Recreation. It is clear that the general powers granted to the City under Article II, Section (21) of the Charter of Baltimore City authorized the establishment, maintenance, control and regulation of parks, squares,

monuments and recreation facilities. Charter Article VII, Sections (61) through (64) spell out the general powers and duties of the Department of Recreation and Parks, and the operation of a day camp center is clearly authorized within these powers and duties.

We must recognize that the establishment of day camp facilities operating in congested areas of the city for the benefit of those children who would otherwise have no access to the programs offered is necessary for the public health, welfare and education. There can be no question that the programs offered are a needed alternative for our neglected poor children who would, if it were not for the camp opportunity, face conditions in the city which are intolerable.

The Court of Appeals, in *Mayor of Baltimore v. State, ex rel. Blueford, supra,* in deciding that the operation of a public swimming pool was a governmental function, quoted with approval from *Heino v. City of Grand Rapids,* 168 N. W. 512, 517 (1918), in an action for the accidental drowning of a small boy in a public pool, where the court said:

> The constitutionally authorized function this municipality was exercising was without private gain to the corporation or to individuals, for purposes essentially public and of a beneficial character in furtherance of the common welfare in harmony with the general policy of the state, and was in its nature a governmental activity, whether it be put upon the ground of health, education, charity, social betterment by furnishing the people at large free advantages for wholesome recreation and entertainment, or all of them.

The Court went on to say in *Blueford* that its conclusion that the operation of the swimming pool was a governmental function was not affected by the fact that the duty of maintaining public parks was permissive and not mandatory on the municipality, nor by the fact that there was no specific authority for the operation of swimming pools, nor by the fact that a nominal fee was charged for the use of the pool.

The City's election to furnish the day camp facilities to its citizens was a permitted exercise of its judgment as to the necessity for the program in the interest of the health, welfare and education of its children. To deny the City the protection of its cloak of governmental immunity in the operation of an activity necessary to the health, education and welfare of its children must have a chilling effect on the ability and willingness of the City to continue to furnish that vitally needed service in the future. We conclude that the trial court erred in finding that the operation of Camp Cahill was a proprietary function of the City and in refusing to grant the City's motion raising preliminary objection.

We cannot conclude this opinion without what, we feel, is required to be said in good conscience. We perceive the result in this case to be eminently unfair, but one required by the present state of the law. Our reading of the record convinces us, as the jury was convinced, that the City's employees failed to provide adequate supervision for the safety and protection of the unfortunate child who lost her life in this accident. Her parents are left without redress in the courts. We invite the Legislature's attention to the question of whether this doctrine should continue to exist. We shall reverse, but justice suggests that the costs of this suit be borne by the appellant.

*Judgments reversed; costs to be paid by Mayor and City Council of Baltimore.*