MAYOR AND CITY COUNCIL OF BALTIMORE *v.* STATE, USE OF JOHN AHRENS ET AL.
[No. 4, April Term, 1935.]

*Decided May 21st, 1935.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*R. E. Lee Marshall, City Solicitor,* and *J. Francis Ireton, Assistant City Solicitor,* with whom was *Edwin J. Wolf, Assistant City Solicitor,* on the brief, for the appellant.

*Joseph W. Spector* and *L. Wethered Barroll,* with whom were *W. Albert Menchine* and *Symone S. Spector* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a judgment entered in the Baltimore City Court, in favor of the equitable plaintiffs, the father and mother of William Wallace Ahrens, an infant slightly over ten years of age, for the loss of services of said infant, by reason of his death; the immediate cause of which was that of drowning.

The record shows that on May 21st, 1933, the deceased, accompanied by several other boys, journeyed to Gwynns Falls, a natural stream flowing through Gwynns Falls Park, one of the parks maintained by the City of Baltimore, in the interest of the public health and welfare of the inhabitants of the city.

The boys were also accompanied by a Mr. Bailey, a Sunday school teacher, who suffered the loss of his own life in a heroic effort to save young Ahrens from drowning. The testimony indicates that Gwynns Falls is a narrow stream generally shallow, but that at one point along its course, designated as Twenty Foot Rock, there is a high natural rock, opposite which the water suddenly reaches a depth of from fifteen to twenty feet. At that point the stream is approximately from thirty to thirty-five feet wide, and the length of the deep section is ap-

proximately fifty feet. Above the rock the stream is not more than two feet deep, and the descent from shallow to the deep part of the stream is sudden.

At Twenty Foot Rock the entire party halted, and it was here that some of the boys doffed their clothing and began swimming in the deep hole. William Wallace Ahrens did not enter the stream at first, but later, while the other boys were swimming, he took off his clothing and waded in the shallow part of the stream, toward the pool. As to whether he intended to enter the deeper part of the stream and join his playmates, or whether he accidentally slipped from the rock nearby, the evidence is conflicting. However, it is evident that he could not swim, as immediately upon getting into deep water he was seen struggling, and heard crying for help. It was in this sad plight that Mr. Bailey noticed him, and plunged in the pool in a futile attempt to save the boy, and at the sacrifice of his own life.

It is conceded that the City of Baltimore owns and maintains Gwynns Falls Park, as one of its parking units.

Section 90 of the Charter of Baltimore City creates a department of public parks and squares of the Mayor and City Council of Baltimore, and provides that the head of said department shall consist of a board of park commissioners composed of five members; section 91 of said Charter provides that the board of park commissioners shall have charge and control of all public parks, squares, boulevards leading to parks, springs, and monuments belonging to and controlled by or in the custody of the Mayor and City Council of Baltimore; and under the provisions of section 92 of the above Charter, the board of park commissioners shall have power, from time to time, to make such rules and regulations for the government and preservation of order within the parks, squares, springs and monuments belonging to, controlled by, or in the custody of the Mayor and City Council of Baltimore, as it may deem expedient.

In pursuance of this latter authority, rule 15 of the rules and regulations of the board of park commissioners,

promulgated on April 4th, 1928, and in force at the time of the death of the deceased, provides:

"No person shall foul or pollute in any manner, any spring, bathing-pool, wading-pool or water course, or bathe or wash in any lake, pond, spring or fountain, nor start the water flowing from any water supply or spigot, other than at a drinking fountain or place provided as a watering place for people or animals, under a penalty of a fine. * * *"

The appellant, the Mayor and City Council of Baltimore, contends that the appellees' son, when he entered Gwynns Falls for the purpose of wading and swimming, became a trespasser, or at most a licensee, notwithstanding the fact that he may have been an invitee to Gwynns Falls Park, and that it is not incumbent upon the municipality to fill in or inclose the deeper sections of a natural stream against those who disregard its regulations and enter therein.

On the other hand, it is contended by the appellees that warnings of the inherent danger of deep water should have been posted about the pool, or that it should have been inclosed, filled in, or guarded. It is shown that at least three prior drownings had occurred at this same pool during the period of five years prior to the death of young Ahrens and his Sunday school teacher, and that nothing had been done by the park board to protect the public from further loss of life at an obviously dangerous point. In other words, the appellees base their right to recover upon the alleged negligent act of omission on the part of the appellant, in permitting the pool at Twenty Foot Rock, in one of its public parks, to remain in its natural state, without official warning as to its danger, without reducing the depth of the pool, and without mechanical or police protection in behalf of public safety.

There are seven exceptions found in the record to rulings of the learned judge who presided at the trial court; six of which deal with the admissibility or rejection of testimony, and one of which deals with the rulings on prayers. All but one of the exceptions to rulings on

evidence were abandoned in this court, and, for the purposes of the conclusion which we have reached, it becomes unnecessary to pass upon the unabandoned exception in the first above group.

Briefly, the vital issue in the instant case is whether or not the maintenance, control and operation of Gwynns Falls Park, as one of the public parks of Baltimore City, under the authority hereinbefore detailed, is the exercise of a governmental function? If that issue be determined in the affirmative, it will necessarily follow that there was error in the rejection by the trial court of the appellant's demurrer prayers E and G, which are specially directed to said issue.

The liability of the defendant (Mayor and City Council of Baltimore) must be determined under a true interpretation of the Constitution and statutes under which it was created and its powers granted and duties imposed.

Under section 1 of the City Charter, it is provided that the appellant may sue or be sued; and the Charter further provides that the executive power of the appellant is vested in the Mayor, the departments, subdepartments, municipal officers not embraced in a specified department, and such special commissions or boards as are provided for under by-laws or ordinances not inconsistent with the Charter of the appellant. Section 31, Charter and Local Laws of Baltimore City, 1927. Among these departments, as heretofore indicated, is that of the department of parks and squares, which is composed of the board of park commissioners.

In the recent case of *Baltimore v. Eagers*, 167 Md. 128, 173 A. 56, 59, in passing upon facts wherein the plaintiff was killed while walking along a street or highway leading through a public square, by reason of the carelessness of employees of the defendant, engaged in removing a large tree from the square, this court, speaking through Judge Parke, said:

"If the neglect or wrongful act was in the course of the performance of a purely governmental duty which

had been imposed upon the municipality as a governmental or public agency by legislative enactment, there would be no liability in tort in favor of an individual who had been injured. This doctrine has general recognition, and various grounds have been assigned in its support, notably, that, at common law, no civil action would lie against a municipal corporation for the neglect of a public duty imposed upon it as the agent of the public by a general law for the benefit of the public generally, and from the performance of which the municipal corporation would receive no profit or special advantage. *Dillon on Municipal Corporations* (5th Ed.) sec. 1643; *Gold v. Baltimore* 137 Md. 335, 112 A. 588; *Wallace v. Baltimore,* 123 Md. 638, 91 A. 687.

"If, on the contrary, the power given and the duty enjoined relate to the local or special interests of the municipality, and be imperative, and not discretionary, legislative, nor judicial, and the wrongful act is done in the performance of such a duty, then the act is said to be done in the private or corporate capacity of the municipality as distinguished from an act done in its political and governmental capacity as an agency of the state, and the municipality must answer civilly for the negligence or want of skill of its agent or servant in the course of his employment, if the wrongful act result in injury to another, who is free from contributory negligence. *Dillon on Municipal Corp.* (5th Ed.) secs. 1645, 1646, 1651, 1665, 1666, 1668; *Consolidated Apartment House Co. v. Baltimore,* 131 Md. 523, 528-536; *Gutowski v. Baltimore,* 127 Md. 502, 508-510, 96 A. 630; *Harris v. Baltimore,* 151 Md. 11, 17, 18, 133 A. 888.

"It is often difficult to determine in a particular instance whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions. The decisions do not furnish a satisfactory test, as they are conflicting in their reasoning and conclusions. In the case at bar the problem concerns not only the beauty, utility, and safe enjoyment by the public

of the square but also the safety of the use of a public way through a square of a municipal corporation. There is no question that, by the great weight of authority, the rule of law is that it is a private proprietary obligation of municipal corporations to keep their streets and public ways reasonably safe for travel in the ordinary manner, and to prevent and remove a nuisance affecting the use and safety of these public ways. This rule is founded on the principles of agency and torts, and exemplifies the basic conception that every one, in carrying through an affirmative course of conduct, must, at his peril, act with due care, according to the circumstances. *Baltimore v. Marriott*, 9 Md. 160; *Consolidated Apartment House Co. v. Baltimore*, 131 Md. 523, 536, 102 A. 920; *Thillman v. Baltimore*, 111 Md. 131, 136, 140, 141, 73 A. 722; *Gutowski v. Baltimore*, 127 Md. 502, 506-510, 96 A. 630; *Wynkoop v. Hagerstown*, 159 Md. 194, 198-200, 150 A. 447."

Numerous cases are cited in the *Eagers* case by Judge Parke, in support of the principle that the maintenance of streets and highways concern the local and special interests of the municipality and is the exercise of a private corporate function, ministerial in its nature, as distinguished from the exercise of various governmental or political functions necessarily incident to municipal government. In point of fact, acts of omission as well as commission, in connection with streets and highways, by municipal and county authorities, whereby injury to person and property results, are answerable in damages in this state, except, of course, where the element of contributory negligence is present. In this respect, at least, the law is well defined.

But as has been stated, the line of demarcation between private, corporate, and ministerial, and governmental, political, and discretionary activities or functions of municipalities is difficult to discern, and more difficult to define.

Local subdivisions of state government are creatures of the various legislatures of the several states. Their powers are defined and limited by their respective legis-

lative creators, and it naturally follows that the construction of various city charters fills the leading text authorities with apparent conflict in the decisions of numerous appellate courts.

In 19 *R. C. L., "Public Parks,"* sec. 68, it is said: "The question whether a system of public parks is owned and operated by a municipality in its proprietary or in its governmental capacity is one upon which the authorities are not in agreement. On one side it is said that the use of the park is in kind analogous to those confessedly public. It closely resembles roads and bridges. These are open to general public travel without reference to the residence of the traveler. The enjoyment of a public park can hardly be restricted to residents of a particular city or town. It cannot be made a source of revenue as may a system of waterworks or sewerage, or gas, electric light, or markets. Its use by those most needing it might be prevented by any pecuniary charge. Historically, the advantages derived from the parks never have been treated as proper subjects for private enterprise, as have the other functions which, when assumed by the city or town, have been regarded as private. On the contrary, parks, in the proper sense, to which the public are regularly admitted, have been inseparably connected with a public agency. The dominant aim in the establishment of public parks appears to be the common good of mankind, rather than the special gain or private benefit of a particular city or town. The healthful and civilizing influence of parks in and near congested areas of population is of more than local interest and becomes a concern of the state under modern conditions."

In the case of *McGraw v. District of Columbia,* 3 App., D. C. 405, the facts are somewhat analogous to the instant case. There a boy of the age of thirteen years and five months, who could not swim, entered the Potomac river from a point near where there was a springing board for diving (which indicated deep water) ; he having also entered the river from the public grounds, at that time surrounding the Washington Monument. He

was drowned, and suit was entered against the District of Columbia by the father of the deceased to recover the value of the services of his son and for funeral expenses. In affirming the judgment for the defendant, the late Judge Morris said: "We cannot accept the theory that the municipality, even if the duty had been imposed upon it of establishing and maintaining this beach, can be held responsible for its safety, and the safe use of it by those who are likely to have recourse to it, in the same manner as streets and highways are to be rendered safe, or even as parks and grounds kept for entertainment and amusement, without direct profit or advantage to the municipality, might have to be maintained in a condition of safety. Land covered by water is necessarily more or less beyond the ordinary control of man; and the margins of streams, rivers and lakes, as well as of the ocean, are subject to a power which the ordinary operations of man may neither determine nor direct. To hold that the margin of a great river, with the mighty volume of water that constantly comes down to disturb its configuration, should be kept level and smooth, free from holes and depressions, and equally safe for the use of adult man and the child of tender years, would be to demand the impossible. It is common experience that the bed of a river is in course of constant change; and that in places the sand and earth are accumulated, in other places excavated or depressed and holes and ravines formed even in a single night. It cannot be that there is any duty imposed upon the municipality that charges it with knowledge of these mutations and requires it to warn the public against them. Neither do we understand that, in the establishment of a free bathing beach, there is any duty imposed upon it to mark in any way the depth or relative depth of the water, so as to guard the ignorant bather from venturing too far. This is a case in which the bather must rely upon his own senses and his own caution; and he has no right to have the municipal authority substituted for the exercise of his own judgment."

We are not to be understood, of course, as construing Gwynns Falls and the Potomac River as being comparable waters. But if a comparison were drawn between the two streams, it would appear that greater danger lurks in the larger and deeper stream, and that, as to both streams, the endless and restless changes of nature are ever taking place upon the bottoms, and in the courses of each.

In these days of advanced civilization, in a period when the unfortunate tendency of many is to abandon the countryside—the haunts of their own youth—and thereby add to the already over congested metropolitan areas, public city parks are almost as necessary for the preservation of the public health as is pure water.

Adventurous youth always has, and ever will, furnish its full death and accident toll. But lamentable as this situation may be, it cannot be corrected by placing upon municipal governments the burden, and the taxation incident thereto, of guarding against the possibilities of fatalities in public parks. The wilds of nature form, in many cases, the very basis of park attractions, and the recreation they afford to multitudes who are unable to secure country environment during the intensely heated seasons of the year.

In a word, to hold municipalities liable in damages, under circumstances such as are revealed in the instant case, would be against public policy, because it would retard the expansion and development of parking systems, in and around our growing cities, and stifle a gratuitous governmental activity vitally necessary to the health, contentment, and happiness of their inhabitants.

Our conclusion, therefore, is that the maintenance, control, and operation of Gwynns Falls Park, by the appellant, is a governmental duty, discretionary in its nature, performed in its political and governmental capacity as an agency of the State.

Because, we think, the case should have been withdrawn from the jury, under the general demurrer prayer offered to that effect, as well as the special pray-

ers to which reference has hereinbefore been made, we will reverse the judgment as to the appellant, without awarding a new trial.

*Judgment reversed, without a new trial, the appellee to pay the costs.*