*Mayor and City Council of Baltimore v. Jamie Wallace*, No. 1644, Sept. Term 2022. Opinion by Shaw, J.

**NEGLIGENCE – PREMISES LIABILITY – RECREATIONAL USE STATUTE**

The General Assembly enacted the Maryland Recreational Use Statute, codified under Maryland Code (1974, 2023 Repl. Vol.), Natural Resources Article ("NR"), sections 5-1101–1109, to encourage any landowner, including local governments, to make land available to the public for any recreational and educational purpose. NR §5-1102(b); NR §5-1105.1(1). The statute limits the owner's liability in tort. NR §5-1102(b).

Consistent with the General Assembly's intent, the Recreational Use Statute does not shield local governments from the well-established common law principle that local governments are not immune from tort liability if performing a proprietary or corporate function, such as maintaining a sidewalk. *See Mayor & City Council of Balt. v. Eagers*, 167 Md. 128, 136 (1934). This includes the maintenance of "public highways" and "walkways" that serve as connectors through parks. *See Haley v. Mayor & City Council of Baltimore*, 211 Md. 269, 273 (1956). The statute does not override local governments' common law duty of care.

Circuit Court for Baltimore City
Case No. 24-C-19-004548

MAYOR AND CITY COUNCIL OF
BALTIMORE

v.

JAMIE WALLACE

Graeff,
Shaw,
McDonald, Robert N.
(Senior Judge, Specially Assigned),

JJ.

Opinion by Shaw, J.

Filed: February 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This is an appeal from the denial of a Motion for Judgment in the Circuit Court for Baltimore City. Appellant, Mayor and City Council of Baltimore, presents one question for our review:

1. Did the circuit court err in finding that the Maryland Recreational Use Statute was inapplicable and denying the City's [M]otion for [J]udgment?

## BACKGROUND

On June 19, 2018, Appellee, Jamie Wallace, was riding her bicycle through the Waterfront Promenade located in Baltimore City on the south side of the Inner Harbor Marina near 402 Key Highway, on her way home from work. While she was cycling, the wheel of her bicycle became stuck in a gap between the granite bulkhead and brick pavers. She was ejected from her bicycle and fell into the Harbor. Ms. Wallace sustained multiple injuries, including a wrist contusion, abrasions to both legs, and a laceration to her right knee.

The Waterfront Promenade is an eight-mile public pedestrian walkway and shared use bicycle path that functions as a waterfront sidewalk for development sites and public spaces. The Baltimore City Charter designated the area within the Waterfront Promenade where Ms. Wallace fell, as "Inner Harbor Park,"[1] and the City's Department of

---

[1] The current Baltimore City Charter, Article I, § 9, states the following regarding Inner Harbor Park:

There is hereby dedicated to public park uses for the benefit of this and future generations of the City of Baltimore and the State of Maryland the portion of the City that lies along the north, west and south shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor to and including Rash Field,

Transportation is responsible for its maintenance. Balt., Md., Charter art. I, § 9. Appellant, the City, is the owner of the property.

On August 28, 2019, Ms. Wallace filed a Civil Complaint in the Circuit Court for Baltimore City against the City. Ms. Wallace alleged that the City breached its duties to her by negligently causing, allowing to remain, and failing to warn her of a dangerous and defective condition on the premises, of which the City had actual and/or constructive knowledge. On November 19, 2020, the City filed a Motion for Summary Judgment, and on January 6, 2021, the court held a hearing on the motion. Following the arguments of counsel, the court denied the City's motion and issued a Memorandum Opinion. The court stated, in pertinent part:

> Defendant argues that the waterfront promenade, where Plaintiff sustained her injuries, is located within a park that the City has made available for recreational use, thereby bringing this matter within the scope of the [Maryland Recreational Use Statute] and thus immunizing the City from liability.
>
> [ . . . . ]
>
> This Court finds the Defendant's argument to be unpersuasive for two reasons. First, it is clear from the record that Plaintiff was commuting to work. (Plt. Opp. Ex. C., Wallace Depo. at 13, 16) It is of no consequence that she might have enjoyed bicycling to work, or even if it was the highlight of her day. She was, therefore, not using the land for recreational or educational purposes. The statute, as discussed in the cases cited by the *Martinez* Court, *supra*, is a *quid pro quo* whereby the landowner makes the property available for educational or recreational purposes and, in exchange, the owner gains

---

except that, in order to provide eating places and other commercial uses, areas totaling not more than 3.2 acres plus access thereto, within the dedicated space and north of an easterly extension of the south side of Conway Street shall be set aside for such purposes; and except that an area of not more than 3.4 acres shall be set aside for use by the Maryland Science Center, plus access thereto. *(Res. 16-029, ratified Nov. 8, 2016.)* [.]

2

immunity from suit initiated by individuals using the property for those purposes [. . . .] Plaintiff simply was not a person "who enter[ed] on the land for these purposes" as contemplated by the MRUS and, therefore, the City is not immune from liability under the statute. The Court also agrees with Plaintiff that the City's position, taken at face value, would yield an absurd result. Under section 5-1101(d)(1) of the MRUS, "roads" are specifically included in the definition of "lands." Thus, under the Defense analysis, the City would be absolutely immune from suit filed by anyone injured while bicycling or jogging on a city street.

Defendant argues that, in addition to the MRUS, the common law doctrine of governmental immunity bars this action because the promenade "cannot be considered a direct connector between two sidewalks," unlike the walkway and steps in *Haley v. Mayor and City Council of Baltimore*, 211 Md. 269 (1956). In *Haley*, the Court found that, although the walkway and steps in question went directly through a park area, they were part of the "public highway of the City" because they directly linked the sidewalks of Franklin Street and St. Paul Street. The problem with Defendant's position is that it views the waterfront promenade in the context of its early days of existence. Since that time, the City's establishment of the Waterfront Management District in 2007 and adoption of the City's Bicycle Master Plan in 2006 changed the nature of the promenade. *See* City Ordinance 07-0851; Plt. Supp. Opp., Ex. B. Indeed, the changing times are reflected in a photograph contained in Plaintiff's expert report, which depicts a person riding an electric scooter on the promenade. (Plt. Opp., Ex. B at 8). These vehicles, authorized by Baltimore City Code, Art. 31, §38-6 and administered by the Department of Transportation, are clearly part of a modern transportation and commuting system that relies on thoroughfares such as the waterfront promenade, which now extends from Canton to Locust Point.

Beginning on October 14, 2022, a two-day trial commenced against the City. Ms. Wallace's counsel read the jury the following stipulation:

Ladies and gentlemen, the parties have agreed, as Your Honor said, by stipulation that on June 19th of 2018, Ms. Wallace alleges that a gap between the bulkhead and the brick pavers of the Inner Harbor near the Rusty Scupper caused her to fall from her bike and suffer injury. The City owns the location that is the subject of this case. The maintenance of the location subject of this case is the responsibility of the City's Department of Transportation. In May of 2012, the City hired an engineering firm to inspect the Inner Harbor from the Rusty Scupper to Pier 6. During this Inspection, it was found that there

were gaps between the granite blocks of the bulkhead and brick pavers along the Promenade where Ms. Wallace alleges she was caused to fall.

In July of 2013, the engineering firm recommended maintenance and repairs of these expansion joints between the bulkhead and the brick pavers.

On November 3rd of 2016, the City received a footways Complaint by a 311 where a picture of the gap Ms. Wallace alleges caused her fall was submitted with the Complaint.

On December 18 of 2017, the City Department of Transportation representative performed a visual inspection of the location that was the subject of this case. During the December 18, 2017 inspection, the Department of Transportation representatives photograph[ed] the specific gap between the bulkhead and the pavers Ms. Wallace alleges caused her injury.

The gap in question was approximately two inches wide, up to eight inches deep and nine feet [*sic*]. The gap in question was a hazardous condition. The City had sufficient opportunity to correct the gap in question.

Ms. Sylvia Deye was Ms. Wallace's first witness, and she was qualified as an expert in architecture and the design of walkways. On August 19, 2020, Ms. Deye completed a site investigation of the south side promenade where Ms. Wallace fell. Ms. Deye testified that the location where the incident occurred is a "built environment" and a "corridor." She stated, "[t]here are multiple places along the promenade for meeting areas and there are benches for meeting and gathering, but it's also a connector between Rusty Scupper and other parts of the City, down to the markets." She testified that the gap at issue was dangerous because it was "deep and [] not level" and noted in her report, that the gap "was not readily apparent in this rich distracting environment making it dangerous for pedestrians and cyclists like Ms. Wallace." On cross examination the City asked Ms. Deye, "[a]s part of your investigation, you learned that this area, part of it is called Inner Harbor

4

Park that was created by City Charter, correct?"  Ms. Deye responded, "[t]here's documentation of that, yes."

Ms. Wallace testified that on the evening of the accident, she left work and took her usual path home on her bicycle.  When she entered the promenade, she noticed a lot of activity and that it was very crowded.  She decided to veer toward the right side of the promenade to avoid pedestrians; and while she was riding, she came to an abrupt stop and blacked out.  Once she regained consciousness, she found herself sitting upright on the rocks in the water waist deep and her knee was completely "busted open."  She recalled someone calling an ambulance and that three gentlemen pulled her out of the water.  Ms. Wallace did not own a car at the time of the incident and in addition to using the bicycle for transportation, she enjoyed riding it, and used it to exercise on her commute.  She stated that she did not have to pay a toll or park access fee to travel through the promenade.

Mr. Robert Bias-Ortiz was jogging on the promenade on the day of the incident and was called as a witness at trial.  While he was on his jog, he learned from two individuals sitting on a bench ahead of him that Ms. Wallace had fallen into the Harbor.  Mr. Bias-Ortiz went to the edge of the promenade and saw Ms. Wallace in the Harbor.  He instructed individuals to help Ms. Wallace out of the water.  He called 911 and requested emergency medical services.  Mr. Bias-Ortiz testified that after Ms. Wallace was pulled out of the water, she was unresponsive to the things being said to her, and that there was a gash in one of her knees and bruising all over her body.  She was eventually taken to the hospital by ambulance.  Mr. Bias-Ortiz described the gap at issue as two inches wide and deep enough that he recalled not being able to see the bottom.

Dr. Joel Fechter, an orthopedic surgeon, examined Ms. Wallace on October 16, 2020. He reviewed Ms. Wallace's treatment records following the June 2018 incident. He testified that Ms. Wallace had a cut on her right hand with controlled bleeding, abrasions to both legs, a laceration to the right knee, and a contusion and sprain to her wrist. Dr. Fechter stated the hospital conducted several imaging studies and x-rays on the day of the incident, including an x-ray of the right wrist which revealed a midcarpal dorsal chip fracture. The hospital treated Ms. Wallace's knee laceration with sutures and put her arm in a splint. Dr. Fechter opined that she sustained a permanent injury to her wrist.

At the close of Ms. Wallace's case, the City moved for judgment citing Maryland Code, Natural Resources §§ 5-1101–1109, commonly referred to as the "Maryland Recreational Use Statute" ("MRUS"). The City argued that the Waterfront Promenade where the incident occurred is located in Inner Harbor Park and that it is an official public park established by the City's Charter. The City contended there was no dispute that the City either directly or indirectly invites or permits, without charge, persons to use the Waterfront Promenade or Inner Harbor Park for any recreational purpose; and therefore, no duty was owed to Ms. Wallace under the MRUS. Ms. Wallace argued that the Waterfront Promenade is not automatically brought within the scope of the MRUS just because the City designated it as a park. She asserted that even public ways that go through parks are still the City's responsibility under Maryland common law. Following the parties' arguments, the court reserved on the City's motion.

At the conclusion of all evidence, the City renewed its Motion for Judgment. The court again reserved on the motion and the case was submitted to the jury. The jury found

the City negligent and awarded Ms. Wallace $100,000.00 in damages. The City then filed a Motion for Judgment Notwithstanding the Verdict asserting that it was entitled to immunity under the MRUS. In a written order, the court denied the City's motion and stated, "[t]he Court denies the motion for the reasons stated by Judge Geller in his Memorandum Opinion[] denying summary judgment." The City timely appealed.

## STANDARD OF REVIEW

A party may file a motion for JNOV only "if that party made a motion for judgment at the close of all evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2-532(a). This Court reviews "the trial court's decision to allow or deny judgment or JNOV to determine whether it was legally correct[.]" *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011). We "review[] without deference a trial court's denial of a motion for judgment notwithstanding the verdict, 'while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party[.]'" *Thompson v. UBS Fin. Services, Inc.*, 443 Md. 47, 56 (2015) (citing *Scapa Dryer Fabrics, Inc.*, 418 Md. at 503).

## DISCUSSION

### A. Recreational Use Statutes

In 1965, the Council of State Governments drafted a model Recreational Use Statute that has since been adopted in various forms in dozens of states. 24 Council of State Governments, *Suggested State Legislation, Public Recreation on Private Lands: Limitations on Liability* 150 (1965); *see Martinez v. Ross*, 245 Md. App. 581, 584 (2020). The Council stated its observations in the preamble of the suggested legislation:

Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. Where the owners of private land suitable for recreational use make it available on a business basis, there may be little reason to treat such owners and the facilities they provide in any way different from that customary for operators of private enterprises. However, in those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.

24 Council of State Governments, *Suggested State Legislation, Public Recreation on Private Lands: Limitations on Liability* 150 (1965).

### 1. The Maryland Recreational Use Statute ("MRUS")

In 1966, the MRUS was enacted as Article 66C, §§ 410J–410P, and currently, the statute is codified under Maryland Code (1974, 2023 Repl. Vol.), Natural Resources §§ 5-1101–1109.  Its stated purpose "is to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public for any recreational and educational purpose, or on a limited entry basis for any recreational hunting purpose, by limiting the owner's liability toward any person who enters on land, water, and airspace above the land and water areas for these purposes."  Md. Code Ann., Nat. Res. § 5-1102(b). In 2000, the statute was expanded to be applicable to a "unit of local government as an owner of land."  Md. Code Ann., Nat. Res. § 5-1105.1; *see* 2000 Md. Laws 2032, ch. 352.

The MRUS provides:

> Except as specifically recognized by or provided in § 5-1106 of this subtitle, an owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition, use, structure, or activity on the premises to any person who enters on the land for these purposes.

Md. Code Ann., Nat. Res. § 5-1103.

The statute further provides:

> Except as specifically recognized by or provided in § 5-1106 of this subtitle, an owner of land who either directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose or to cut firewood for personal use does not by this action:
>
> (1) Extend any assurance that the premises are safe for any purpose;
> (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or
> (3) Assume responsibility for or incur liability as a result of any injury to the person or property caused by an act of omission of the person.

Md. Code Ann., Nat. Res. § 5-1104.

When the statute was first enacted, the term "land" was defined as "land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty." Art. 66C, § 410K(a); *see* 1966 Md. Laws 574, ch. 292. As the statute evolved, the General Assembly incorporated "paths" and "trails" into the current definition of "land." Md. Code Ann., Nat. Res. § 5-1101(d)(1); *see* 2000 Md. Laws 2033, ch. 352.

The General Assembly has also amended the definition of "recreational purpose" substantially since it was first enacted. Md. Code Ann., Nat. Res. § 5-1101(g). In 1966, "recreational purpose" was defined as "any of the following, or any combination thereof;

9

hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic or scientific sites." *See* 1966 Md. Laws 574, ch. 292. In 1973, the General Assembly amended the definition of "recreational purpose" to also include "horseback riding or horse driving, operating motorized recreational vehicles." *See* 1973 Md. Laws 827, ch. 4. In 1988, the statute was amended to include "hang gliding, hot air ballooning, and operating light airplanes and other forms of recreational aircraft." *See* 1988 Md. Laws 4597–98, ch. 692. In 1989, the statute was amended to include "jogging" and "marathon racing." *See* 1989 Md. Laws 3825, ch. 639. Finally, in 2000, the statute was amended and the definition of "recreational purpose" was redefined as "any recreational pursuit." *See* 2000 Md. Laws 2033, ch. 352.

### B. Common Law

Under the common law, the duty of care an owner or occupier of land owes a visitor, depends on "whether the entrant is an invitee, licensee, or trespasser." *Deboy v. City of Crisfield*, 167 Md. App. 548, 555 (2006). "The highest duty is that owed to an invitee; it is the duty to 'use reasonable and ordinary care to keep [the] premises safe for the invitee and to protect [the invitee] from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for [the invitee's] own safety will not discover.'" *Id.* (citing *Rowley v. Mayor*, 305 Md. 456, 465 (1986)). "A property owner 'has no duty to warn an invitee of an open, obvious, and present danger.'" *Six Flags Am., L.P. v. Gonzalez-Perdomo*, 248 Md. App. 569, 582 (2020) (citing *Casper v. Chas. F. Smith & Son, Inc.*, 316 Md. 573, 582 (1989)).

10

A local government or municipality may be immune from traditional common law liability if the government is performing a governmental function, such as maintaining a public park.[2] *See Mayor & City Council of Balt. v. Ahrens*, 168 Md. 619, 628 (1935). However, a local government is not immune if performing a proprietary or corporate function, such as maintaining a sidewalk. *See Mayor & City Council of Balt. v. Eagers*, 167 Md. 128, 136 (1934).

## I. The circuit court did not err in finding that the Maryland Recreational Use Statute was inapplicable and in denying the City's Motion for Judgment.

In Maryland, the MRUS has been interpreted in two reported decisions: *Fagerhus v. Host Marriott Corp.*, 143 Md. App. 525 (2002), and *Martinez v. Ross*, 245 Md. App. 581 (2020). In *Fagerhus*, Appellant, Geir Fagerhus, was running on a fitness trail located on a hotel's property, when he fell on black ice and injured his shoulder. 143 Md. App. at 532. Appellant sued Appellees, the property owner, the property manager, and the manager of the hotel where Appellant was staying at the time of the fall. *Id.* at 533. The property owner and the property manager jointly moved for summary judgment, arguing that they had no duty to inspect or make the trail safe for Appellant's recreational use. *Id.* at 534. The hotel manager moved for summary judgment on the grounds that it did not own or maintain the portion of the trail where Appellant fell. *Id.* The trial court granted the property owner and the property manager's motions for summary judgment, finding that Appellees had no duty to make the trail safe for Appellant's recreational use under the

---

[2] No issue of governmental immunity is presented in this appeal.

MRUS. *Id.* Additionally, the court granted the hotel manager's motion concluding that it "'had no duty because there was a lack of relationship' in that it 'had no ownership interest whatsoever' in the property where Fagerhus fell." *Id.* On appeal, this Court reviewed whether the property owner and the property manager were the "type of property 'owners' that the legislature intended to insulate" under the MRUS. *Id.* at 538.

In interpreting the purpose of the Statute, we stated:

When a landowner permits others to use its property for unsupervised recreational activities without charge, the landowner is making available private land for public recreational purposes in precisely the manner that the MRUS is designed to encourage. The promise of the MRUS is that when the landowner does so, it does not take on any duty to the recreational users. Under section 5-1104, then, even a "direct" or "indirect" invitation to use the land for recreational purposes without charge does not "[e]xtend any assurance that the premises are safe for any purpose," does not "[c]onfer upon the person the legal status of invitee or licensee to whom a duty of care is owned," and does not "[a]ssume responsibility for or incur liability as a result of any injury to the person ... caused by an act [or] omission of the person." NR § 5-1104. *See, e.g., Johnson v. Unocal Corp.*, 21 Cal.App.4th 310, 26 Cal.Rptr.2d 148, 152 (1993) (affirming summary judgment against plaintiff injured during company picnic held on property that owner invited others to use for scheduled events); *Peterson v. Midwest Sec. Ins. Co.*, 238 Wis.2d 677, 617 N.W.2d 876, 880 (2000) (affirming summary judgment against plaintiff injured while hunting on property that owners invited nephew to use for hunting, along with any companions he wanted to bring).

*Id.* at 540–41.

We held that the MRUS protects both property owners and property managers, as the term "interest in property" is to be construed broadly, consistent with the legislative history of the MRUS. *Id.* at 542–43. We concluded that a property manager with a contractual duty to manage and maintain premises that a landowner makes available for

12

recreational use is an "owner" who is entitled to invoke the protections of the MRUS. *Id.*
at 544. The trial court's grant of summary judgment for Appellees was affirmed. *Id.*

In *Martinez*, we considered the meaning of the term "available to the public" under
the MRUS. 245 Md. App. at 590. Appellee, Daniel Ross, owner of Penn Shop Farms
LLC, hosted a social event on his property. *Id.* at 585. He invited approximately ninety
guests, including Appellant, Anthony Martinez. *Id.* On the morning of the social event,
Mr. Martinez helped Mr. Ross transport all-terrain vehicles (ATV) from Mr. Ross's home
to the Penn Shop Farm, and while crossing one of the courses, Mr. Martinez fell off the
ATV and suffered a spinal injury. *Id.* at 586. Mr. Martinez filed a lawsuit for negligence
against Mr. Ross, and Mr. Ross moved for summary judgment under the MRUS. *Id.* Mr.
Martinez opposed the motion arguing that the MRUS did not apply because Mr. Ross did
not make his land "available to the public." *Id.* Mr. Ross argued the immunity provisions
of the act did not specifically require that a landowner open the land to the general public.
*Id.* In examining the purpose of the statute, we said:

> In view of the express purpose of the model act, courts have recognized that
> the legislation contains a statutory quid pro quo: in exchange for "opening
> lands for recreational use by the public," owners receive "a special statutory
> grant of qualified immunity from suit by such recreational users." *Gibson v.
> Keith*, 492 A.2d 241, 246 (Del. 1985); *accord Conant v. Stroup*, 183 Or.App.
> 270, 51 P.3d 1263, 1267 (2002) ("the model act expressed a basic quid pro
> quo in its declaration of policy, namely, permission to the general public to
> use private land for recreational purposes in exchange for immunity from
> liability for resulting injuries") (emphasis in original); *Bucki v. Hawkins*, 914
> A.2d 491, 497 (R.I. 2007) (stating that "statutory immunity cannot attach
> when property is not held open to the public for recreational activity");
> *McMillan v. Parker*, 910 S.W.2d 616, 618 (Tex. App. 1995) (stating that "the
> statutory limitation on liability was meant as an inducement for owners of
> certain types of private land to allow members of the general public to use

such lands for recreational pursuits"); *see also Estate of Gordon-Couture v. Brown*, 152 N.H. 265, 876 A.2d 196, 200 (2005).

> "[A]n invitation or permission (direct or indirect) extended by a landowner to the public to enter without charge for recreational purposes is a sine qua non for invoking the statute's protective benefits." *Gibson v. Keith*, 492 A.2d at 244. "If private landowners will make their lands available to the general public for recreational purposes, the state will 'trade' that public access for immunity from liability that might result from the use of the property." *Conant v. Stroup*, 51 P.3d at 1266 (emphasis in original).

*Id.* at 593.

We reversed the circuit court's grant of summary judgment based on the MRUS, holding that the property was not open to the general public, and instead was only made available to a large number of social guests who had been invited to the gathering on the property. *Id*. at 603–05. We stated that when "[r]ead literally and in isolation from the expression of the statutory purpose, the operative portions of the statute could be understood to limit an owner's common-law liability to anyone, including social guests, who came onto the property for educational or recreational purposes." *Id.* at 594. This Court rejected that approach, holding that, "[a]s explained by the Council of State Governments, recreational use statutes such as ours limit the liability of owners who open their land to the public 'on the theory that *it is not reasonable to expect such owners to undergo the risks of liability for injury to … strangers* from whom the accommodating owner receives no compensation or other favor in return.'" *Id.* at 605 (citing 24 Council of State Governments, *Suggested State Legislation, Public Recreation on Private Lands: Limitations on Liability*, *supra*, 150, preamble). We interpreted the statute as a whole, in accordance with its express purpose and declined to "commit the error of reading its

14

sections in isolation." *Id.* at 597. The *Martinez* Court interpreted the MRUS as an exception and not a nullification of common law principles of premises liability.

In the present case, the City argues, pursuant to the MRUS, that local governments are immune from common law torts that occur on land made available to the public for recreational use without charge. The City contends the area where Ms. Wallace fell was such a location and the City should have been granted judgment as a matter of law. The City asserts the court incorrectly found the MRUS was inapplicable, as the statute is not dependent upon the actions or intent (subjective or objective) of the entrant, but instead, only requires that a landowner make land available for recreational use without charge. The City further contends even if Ms. Wallace's intent was considered in analyzing the MRUS, she was both objectively and subjectively engaged in a recreational pursuit when she fell.

Ms. Wallace argues the MRUS does not shield the City from liability for negligently allowing a dangerous condition to exist on a walkway. She cites to *Haley v. Mayor & City Council of Baltimore*, 211 Md. 269 (1956). She asserts that public sidewalks are among the classic items of municipal property that local governments must, under the common law, exercise due care to maintain and the MRUS must be strictly construed with common law principles in mind. Ms. Wallace contends that even if the MRUS was applicable, the City would not be immune from liability. She argues the statute's application requires a determination as to whether: (1) the City made the Baltimore Waterfront Promenade available to the public "for" any recreational purpose; and (2) whether Ms. Wallace was using it "for" a recreational purpose. Ms. Wallace maintains that the promenade functions

as a waterfront sidewalk and is an intrinsic part of the business and economic development, and the nature of the promenade is sufficient to establish that the City did not make the land available "for" a recreational purpose. She argues the analysis in this case need go no further than examining the nature of the promenade. Alternatively, she contends the nature of her activity on the promenade was not for a recreational purpose because she was commuting home from work when her injury occurred, and commuting is not typically recreation.

In *Haley v. Mayor & City Council of Baltimore*, the Supreme Court of Maryland was tasked with determining whether the City of Baltimore was liable to the appellants who were injured while walking down steps that were a part of a concrete walk located in Preston Gardens, a public park maintained by the City. 211 Md. 269, 271 (1956). The Court noted:

> These steps were a part of a concrete walk connecting two intersections: one formed by St. Paul Street, Franklin Street and the Orleans Street Viaduct on the upper level, and the second formed by St. Paul Place and Franklin Street on the lower level. This concrete walk, including the column of steps where the accidents occurred, traverses a grass plot lying between and running parallel with St. Paul Street and St. Paul Place and furnishes the most direct access between the aforesaid intersections of public highways.

*Id.*

In examining whether the maintenance of the concrete steps was a governmental function, the Court stated "[t]he mere physical location of the passageway within the park does not of itself decide the function. The use of a particular facility is a determining factor." *Id.* The Court held the steps constituted a "public highway" of the City and

16

"[we]re so located as to constitute a straight and direct connecting link between the sidewalks on Franklin Street east and west of St. Paul Place and St. Paul Street." *Id*. at 272–73. The Court highlighted that the appellants used the steps "to travel between points which were outside the park and not for recreational purposes" and "that numerous persons use[d] these steps and walkways to travel from St. Paul Street to St. Paul Place and vice versa." *Id.* at 273. The Court stated:

> The law of this State is well established that a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, such as the maintenance and management of a public park for recreational purposes. *Mayor and City Council of City of Baltimore v. State, Use of Blueford*, 173 Md. 267, 195 A. 571, and cases therein cited; *Mayor and City Council of City of Baltimore v. State, Use of Ahrens*, 168 Md. 619, 179 A. 169, 99 A.L.R. 680; *Thomas v. Prince George's County*, 200 Md. 554, 92 A.2d 452. On the other hand, the keeping of public highways and walkways under its management and control in a reasonably safe condition is a corporate function of a municipality and it is therefore answerable in damages for failing to exercise such function. *Mayor and City Council of City of Baltimore v. Eagers*, 167 Md. 128, 136, 173 A. 56.

*Id.* at 272–73.

The Court found that *Mayor and City Council of City of Baltimore v. Eagers*, 167 Md. 128 (1934), was controlling where "the plaintiff was killed while walking along a street in a public square, by reason of the carelessness of employees of the defendant engaged in removing a large tree from the square." *Id.* at 273. The *Haley* Court quoted the *Eagers* opinion, stating:

> There is no question that, by the great weight of authority, the rule of law is that it is a private proprietary obligation of municipal corporations to keep their streets and public ways reasonably safe for travel in the ordinary manner, and to prevent and remove a nuisance affecting the use and safety of these public ways.

17

*Id.* at 274 (quoting *Eagers*, 167 Md. at 136).

The *Haley* Court ultimately determined that even though the concrete walk was within the boundaries of the park and maintained by the City's Department of Recreation and Parks, the location of the walk, between two busy downtown intersections, required that it be classified as a public way. *Id.* The Court reversed the trial court and held that the City could have been found liable since the steps in question were a part of a public highway. *Id.* To be clear, *Haley* focuses on local governments' obligations to keep public ways safe and is an examination of the common law. It continues to be binding precedent and has not been overruled.

In 2006, the Supreme Court of Maryland revisited the issue of common law liability in *Mayor & City Council of Baltimore v. Whalen*, 395 Md. 154 (2006). The Respondent, Ms. Whalen, fell into a utility hole while walking her dog in Leone Riverside Park, a public park maintained by the City's Department of Recreation and Parks. *Id.* at 158, 169. The City argued that municipalities are not liable for negligence in maintaining public parks because doing so has traditionally been considered a governmental function. *Id.* at 162. Ms. Whalen argued that the City was not entitled to governmental immunity because the maintenance of streets, public ways, and the areas contiguous and adjacent to them is a proprietary function of government. *Id.*

The Supreme Court examined whether a municipality is entitled to immunity from a tort claim where the municipality negligently maintained a public park. *Id.* at 157. The Court noted the utility hole was located within the boundaries of the park and was not within the boundaries of a nearby street. *Id.* at 162. The Court held "the obligation of the

18

petitioner to maintain, operate, and control Leone Riverside Park was a governmental duty, discretionary in its nature, and performed in its governmental capacity" and that Ms. Whalen "was not on a public way when she fell into the utility hole. She was within the boundaries of the Leone Riverside Park." *Id.* at 169. The Court affirmed the trial court's ruling that the City was entitled to governmental immunity because the injury took place within the boundaries of a public park but outside the boundaries of a public way. *Id.* at 170. The Court found it unnecessary to address the City's additional defenses including, "statutory immunity under a recreational use statute, and lack of actual or constructive notice of the danger posed by the uncovered utility hole" considering the status and disposition of the case. *Id.* at 157.

Returning to the present case, it is undisputed that Ms. Wallace fell in an area in the Inner Harbor Park which is within the Waterfront Promenade and is maintained by the City's Department of Transportation. As previously noted, the Waterfront Promenade is a public pedestrian walkway and shared use bicycle path that functions as a waterfront sidewalk and stretches eight miles. The promenade "follows the water's edge from Canton Waterfront Park through Canton, Fells Point (including Broadway Pier) and Harbor East to connect with Inner Harbor Park and along the south and east shore to Webster Street and includes all Public Access Corridors as designed in an Urban Renewal Plan or other controlling document and as new sections may be opened beyond these locations." Department of Recreation and Parks, *Rules and Regulations of the City of Baltimore* 26 (2013).

In 2006, the City's Department of Planning implemented a Master Bike Plan, which permitted bicycles in the promenade at all hours of the day to provide additional access to serve users who sought "an alternative to streets like Boston and Key Highway, or who are traveling to or from waterfront destinations such as residences, yachts, restaurants, and places of employment." Department of Transportation, *City of Baltimore Bicycle Master Plan* 30–31 (2006).

In light of the City's Charter, Rules and Regulations, Master Bike Plan and evidence regarding the promenade's usage, we hold that the property serves as a public connector to other parts of the City. It does not serve as a property, park or land that was made available for recreational purposes. As stated by the *Haley* Court, "[t]he mere physical location of the passageway within the park does not of itself decide the function. The use of a particular facility is a determining factor." *Haley*, 211 Md. at 272. Here, the property's use is to serve as a connecter.

In further analyzing whether the MRUS is applicable, we examine the language of the statute. It is well established that, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Bd. of Educ. of Baltimore Cnty. v. Zimmer-Rubert*, 409 Md. 200, 214 (2009) (citing *Kushell v. DNR*, 385 Md. 563, 576–77 (2005)). "To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). "Where the statutory language is subject to more than one reasonable interpretation, or its meaning is not clear when considered in conjunction with other statutory provisions, we may glean the legislative intent from external sources." *Aleti v.*

*Metro. Baltimore, LLC*, 251 Md. App. 482, 504 (2021), *cert. granted*, 476 Md. 263 (2021), and *aff'd*, 479 Md. 696 (2022); *Johnson v. Md. Dep't of Health*, 470 Md. 648, 674 (2020) (quoting *In re R.S.*, 470 Md. 380, 403 (2020)). "[W]e may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions." *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 295 (2017) (quoting *Bellard v. State*, 452 Md. 467, 482 (2017)).

> Section 5-1104 provides:
>
> Except as specifically recognized by or provided in § 5-1106 of this subtitle, an owner of land who either directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose or to cut firewood for personal use does not by this action:
>
> (1) Extend any assurance that the premises are safe for any purpose;
> (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or
> (3) Assume responsibility for or incur liability as a result of any injury to the person or property caused by an act of omission of the person.

Md. Code Ann., Nat. Res. § 5-1104.

In 2000, the bill that extended immunity to local governments was 2000 House Bill 296. In the Floor Report for 2000 H.B. 296, the Senate Economic and Environmental Affairs Committee stated: "This bill is intended to encourage private property owners and local governments to allow recreational or educational activity on their land. It does this

21

by limiting the liability that a private landowner or local government will incur if a person is injured during a recreational or educational activity on the land." [3]  Floor Report, H.B. 296 at 1.  The Floor Report further provided the current law:

> Q. What is [the] current law?
>
> A. Under current law, private land owners who allow others to use their land for recreational purposes incur no liability for personal injury or property damage arising out of recreational use except when the landowner willfully or maliciously fails to warn of danger or charges for the use of the land.
>
> Q. Don't local governments have the same immunity as the State?
>
> A.  No, currently local governments are immune for the performance of their governmental functions, but not for the performance of their proprietary functions. Under common law, the maintenance of a park has been determined to be a "governmental" function, for which a local government is immune from liability, unless they waive their immunity. This bill does not alter a local government's immunity defense.
>
> Q. How do "governmental functions" differ from "proprietary functions?"
>
> A. Government functions are those activities traditionally provided to citizens as a local government service and are not profit oriented enterprises. Proprietary functions are those activities that could be provided by a business and that could be turned into a source of revenue to the local government, such as a parking garage.

Floor Report, H.B. 296 at 2.

In a letter located in the bill file for 2000 HB 296, Assistant Attorney General Richard E. Israel wrote to Senator Nancy C. Jacobs on June 17, 1999, in response to her

---

[3] *See Daughtry v. Nadel*, 248 Md. App. 594, 622 (2020) (citing *Hayden v. Md. Dep't of Nat. Res.*, 242 Md. App. 505, 530 (2019)) ("[i]n analyzing a statute, Floor Reports often serve as 'key legislative history documents.'").

"request for advice of counsel concerning the liability of State and local governments for skateboard accidents in their public parks." Assistant Attorney General Israel stated:

> Historically, courts and municipal governments have not enjoyed the same immunity as the State. Historically and at the present time, local governments are immune for the performance of their governmental functions but not for performance of their proprietary functions. *Bradshaw v. Prince George's County*, 284 Md. 294, 300 (1979), *Austin*, 286 Md. at 53, *Kranz*, 308 Md. at 622. Under the Local Government Tort Claims Act, Courts and Judicial Proceedings Article. §§5-301 through 5-304, as amended by Chapters 34, 177, 194 and 637, *Laws of Maryland*, 1999, local governments are liable for the torts of their employees. However, this Act does not alter the historic immunity of a local government when sued in its own capacity. *Khawaja v. Mayor and City Council of Rockville*, 89 Md.App. 314. 325–328 (1991), *cert. granted* 325 Md. 551 (1992), *appeal dismissed* 326 Md. 501(1992).
>
> Although the distinction between governmental and proprietary functions is somewhat illusory in practice, it has been said that the classification depends on whether "the act performed is for the benefit of all or for the special benefit or profit of the corporate entity." *Tadjer v. Montgomery County*, 300 Md. 539. 546–547 (1984). Thus, the maintenance and operation of public parks and other recreation facilities are generally regarded as governmental functions, even if a small fee is charged. *Blueford*, 173 Md. at 272–273 and 276; *Haley v. Mayor and City Council of Baltimore*, 211 Md. 269, 272–273 (1956); and *Austin*, 286 Md. at 63–64. However, quite anomalously, the maintenance of streets and walkways in a reasonably safe condition is considered a proprietary function. Therefore, local governments are liable for damages if their negligence in performing this function is the proximate cause of injury or damage to those who travel on the streets or walkways. *Haley*, 211 Md. at 273. *County Commissioners v. Staubitz*, 231 Md. 309, 314 and 318; *Tadjer*, 300 Md, at 548.
>
> In the *Haley* case, 211 Md. at 273–273[*sic*], the Court held that steps in a public park which were used to travel between two streets, and not for recreational purposes, constituted a public highway. The Court noted that "[t]he use of a particular facility is the determining factor." *Id.* at 272 *but compare Higgins v. City of Rockville*, 86 Md. App. 670, 682–685, *cert. denied* 323 Md. 309 (1991).

Letter from Assistant Attorney General Richard E. Israel, to Senator Nancy C. Jacobs (June 17, 1999).

In our review, we found no indication that common law principles or *Haley*, were to be affected by the enactment of the legislation. Based on the correspondence and Floor Report, it is clear that when the General Assembly enacted the 2000 version of the MRUS, making it applicable to local governments, it was aware of the common law principle that local governments are liable for damages if their negligence in performing a proprietary function is the proximate cause of injury to those who travel on the streets or walkways. The question then arises, why did the General Assembly extend immunity to local governments under the MRUS if they already had immunity under the common law? To that question, again, we turn to the legislative history. In a letter located in the bill file for 2000 HB 296, dated March 21, 2000, and addressed to the Chairman and Members of the Senate Economic and Environmental Affairs Committee, Delegate Tod D. Sher, the lead sponsor of the bill, stated:

> Coverage of local government. The current law is unclear whether [the MRUS] applies to public as well as private landowners. Local governments, even though they currently enjoy sovereign immunity in recreation situations, have requested clarification that the standards of this law would apply if courts should in some way limit sovereign immunity in the future.

Letter from Delegate Tod D. Sher, to the Chairman and Members of the Senate Economic and Environmental Affairs Committee (March 21, 2000).

According to the letter, the MRUS was extended to local governments to provide clarity in the statute, and to serve as an alternative source of immunity for local governments, if protections under the common law were to no longer exist in the future. The bill file does not contain any other items that suggest otherwise. There is nothing in

24

the plain language of the statute or the legislative history to suggest that the General Assembly intended to abrogate *Haley*.

As such, we agree with Ms. Wallace that the MRUS does not apply in the case at bar. *Haley* remains a vital precedent, and our analysis of the legislative history confirms that the common law has not been abrogated and the facts in the case at bar are in accord with what *Haley* dictates. We, therefore, affirm the circuit court's decision. However, we do so, on slightly different grounds.[4] The circuit court determined that the statute was not applicable because Ms. Wallace was not subjectively engaged in recreation at the time of the incident, but instead was commuting from work. The court also found the City's position, "taken at face value, would yield an absurd result" in that the City would be "absolutely immune from suit filed by anyone injured while bicycling or jogging on a city street." We agree with the court's conclusion that the MRUS was not applicable and in doing so, we need not examine whether Ms. Wallace was using the property for a "recreational purpose."

At the time of the incident, Ms. Wallace was riding her bicycle home from work through Inner Harbor Park, a connector and a public way "to travel between points which were outside the park and not for recreational purposes." *Haley*, 211 Md. at 273. It was not a "public park." *See Whalen*, 395 Md. at 170. Additionally, we disagree with the

---

[4] *See Nottingham v. State*, 227 Md. App. 592, 614 (2016) (stating that an appellate court may "affirm a judgment on any ground apparent from the record"); *see also Norman v. Borison*, 192 Md. App. 405, 419 (2010) ("[i]t is well established in Maryland that, in an appeal from a final judgment, the appellate court may affirm the court's decision on any ground adequately shown by the record").

City's contention that the General Assembly expressly included "paths" in the definition of land, and therefore that the MRUS applies. The statute must be read to effectuate its purpose and it does not override an owner's, in this case, the City's common law duty of care. Here, we hold the MRUS is not applicable.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**